**COMMONWEALTH OF PENNSYLVANIA, Attorney General of the Commonwealth of Pennsylvania, City of Philadelphia, and Alan Levi Bond, by his mother, Mrs. Ruby Bond, Charles William Hicks and Theodore Lewis Hicks, by their mother, Mrs. Marie Hicks, James Scruggs and Henry Scruggs, by their mother, Mrs. Ardella Scruggs, and Tyrone Karl White and Terry Sherwood White, by their mother, Mrs. Charlotte L. White, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Revelle W. BROWN et al., Trustees of the Estate of Stephen Girard, Defendants.**

**Civ. A. No. 39404.**

United States District Court
E. D. Pennsylvania.

Nov. 2, 1966.

---

William T. Coleman, Jr., of Dilworth, Paxson, Kalish, Kohn & Dilks, Drinker, Biddle & Reath, by Charles J. Biddle and Cuthbert H. Latta, J. Alan Kugle, Sp. Counsel, Philadelphia, Pa., for plaintiffs.

Edward G. Bauer, Jr., City Sol., Matthew W. Bullock, Jr., Deputy City Sol., Philadelphia, Pa., for City of Philadelphia.

Morgan, Lewis & Bockius, by Arthur Littleton, John Russell, Jr., Ernest R. vonStarck and Richard P. Brown, Jr., Thomas J. Gaffney, of Gaffney & Gaffney, Philadelphia, Pa., for defendants.

Harrison Kildare, of Rawle & Henderson, Philadelphia, Pa., William D. Valente, Villanova, Pa., Jerome J. Shestack, of Schnader, Harrison, Segal & Lewis,

Murray H. Shusterman and Leon I. Mesirov, Philadelphia, Pa., for amici curiae.

## INTRODUCTION

JOSEPH S. LORD, III, District Judge.

After we had previously denied defendants' motion to dismiss under F.R. Civ.P. 12, holding that count three of the complaint stated a cause of action, Commonwealth of Pennsylvania et al. v. Brown et al., 260 F.Supp. 323 (E.D.Pa., 1966), plaintiffs moved for a preliminary injunction under that count. A hearing was held and because the evidence adduced there was exhaustive, upon counsels' representation that no additional evidence on that count would be offered on final hearing, we ordered that the trial on the merits of count three be consolidated with the hearing on preliminary injunction and that the preliminary hearing be treated as if on final hearing. F.R.Civ.P. 65(a) (2). We will direct the entry of final judgment for plaintiffs on count three on the basis of the following findings of fact, discussion, and conclusions of law.

## FINDINGS OF FACT

1. Plaintiffs are, Alan Levi Bond, by his mother, Ruby Bond; Charles William Hicks and Theodore Lewis Hicks, by their mother, Marie Hicks; James Scruggs and Henry Scruggs, by their mother Ardella Scruggs; Tyrone Karl White and Terry Sherwood White, by their mother Charlotte L. White.

2. Defendants are, Revelle W. Brown, John A. Diemand, Dr. Gilson Colby Engel, Fred Fox, Walter S. Franklin, Walter B. Gibbons, Esquire, Hubert J. Horan, Jr., Esquire, Dr. Louis P. Hoyer, Frederick H. Levis, David F. Maxwell, Esquire, Mrs. Mina F. Oliver, Roland Rodrock Randall, Harry G. Schad, Trustees of the Estate of Stephen Girard, who control, direct and operate Girard College.

3. The President of Girard College is Karl Friedman, and the Director of Admissions of Girard College is Emil Zarella, each of whom is under direct control and supervision of the defendants.

4. The present action is brought by the individual infant plaintiffs on behalf of themselves and all others similarly situated.

5. The matter here in controversy exceeds the sum of $10,000 exclusive of interest.

6. Girard College is located on a tract of ground approximately 43 acres in extent. There are about 25 buildings on the campus and the whole is surrounded by a stone wall 10 feet in height as prescribed in the will of Stephen Girard. There are only two gates in this wall, one being a service gate which is kept closed except for deliveries and the other being a main gate at which a watchman is constantly stationed. The public is not permitted in and the children are not permitted out except by special permission.

7. No orphan boy is admitted into the institution until after the mother or guardian has made formal application and the boy has been examined by the resident doctors, the institution's psychologist, and tested for both intelligence and achievement. The mother, if any, is also interviewed by the institution's field representatives, or social workers. The Admissions Committee, consisting of the psychologist, the Director of Admissions and the physician, makes its recommendation as to each applicant to the President of the College who in turn makes his recommendation to the Trustees. Only the Trustees can approve final admission. From 25% to 30% of the applicants are rejected for psychological, intellectual or educational reasons.

8. Upon introduction into the College the mother or guardian of the orphan executes a document under which the legal custody and control of the orphan is transferred to the Trustees so long as the orphan remains in attendance at the institution. If the boy's home is not approved by the institution, he remains at the institution continuously.

9. Plaintiffs are each poor fatherless males between the ages of six through ten, each of whom was born and resides in the City of Philadelphia.

10. The will of Stephen Girard, as interpreted by defendants, permits the admission of boys who have not yet reached their eleventh birthday.

11. Each of the plaintiffs has applied for admission to Girard College, but defendants refused to consider such applications solely because plaintiffs were deemed not to be "white" without any consideration of whether they were otherwise qualified.

12. Each of the plaintiffs and the mothers of each of the plaintiffs want the said plaintiffs to attend Girard College as soon as possible.

13. Paragraph XX of the will of Stephen Girard recites that he was "impressed with the importance of educating the poor" and that he was desirous to provide for the objects of his bounty "a better education."

14. Paragraph XXI provides for the erection of "a permanent College." The same paragraph provides:

"When the college and appurtenances shall have been constructed, and supplied with plain and suitable furniture, and books, philosophical and experimental instruments and apparatus, and all other matters needful to carry my general design into execution; the income issues and profits of so much of the said sum of two millions of dollars as shall remain unexpended shall be applied to maintain the said college according to my directions:

"1. The institution shall be organized as soon as practicable, and to accomplish that purpose more effectually, due public notice of the intended opening of the college shall be given—so that there may be an opportunity to make selections of competent instructors, and other agents, and those who may have the charge of orphans may be aware of the provision intended for them:

"2. A competent number of instructors, teachers, assistants and other necessary agents, shall be selected, and when needful their places from time to time supplied: they shall receive adequate compensation for their services: but no person shall be employed, who shall not be of tried skill in his or her proper department, of established moral character—and in all cases persons shall be chosen on account of their merit, and not through favor or intrigue.

\* \* \* \* \* \*

"7. \* \* \* They shall be instructed in the various branches of a sound education, comprehending reading, writing, grammar, arithmetic, geography, navigation, surveying, practical mathematics, astronomy, natural, chemical, and experimental philosophy, the French and Spanish languages [I do not forbid, but I do not recommend, the Greek and Latin Languages]—and such other learning and science, as the capacities of the several scholars may merit or warrant: I would have them taught facts and things, rather than words or signs: \* \* \* "

15. The will of Stephen Girard has always been administered in accordance with these directions.

16. The defendants have issued brochures and pamphlets describing Girard College as a school, of which the following are examples:

"Girard College, founded in 1831 under the Will of Stephen Girard, was opened on January 1, 1848. It is a privately endowed, free boarding school for fatherless boys from six to eighteen years of age. It maintains and educates free of charge as many boys as the income from the endowment will permit. The present enrollment is approximately eight hundred boys.

"The school provides in every particular for each boy admitted. In addition to his living and the care of his health, it offers him an elementary school education and a comprehensive secondary school course, providing the

credits in academic subjects required for entrance to college, together with vocational training along either business or trade shop lines. The college preparatory curriculum is complemented by a general education course. Personal, social and educational guidance, basic military education, athletics and physical education, art, library, instrumental and vocal music augment academic and vocational offering. All combine not alone to prepare boys successfully for college, for business and trade positions, but also for successful, happy living in a complex American social life." (P–1).

\* \* \* \* \* \*

"GIRARD a free private boarding school for boys who have lost their fathers by death \* \* \*" (P–16).

17. Girard College is a primary school, a secondary school and a high school, and is an educational institution, although only one-third of the cost of running it is attributed to educational functions.

18. Girard College is supervised by the Commonwealth in that, inter alia, under the Act of March 10, 1949, P.L. 30, 24 P.S. § 1–101 et seq., all persons in Pennsylvania between the ages of 8 and 17 are required to attend "a day school in which the subjects and activities prescribed by the State Council of Education are taught in the English language" and that "such child or children shall attend such school continuously throughout the entire term during which the public elementary schools in their respective districts shall be in session."

19. The Act of March 10, 1949, P.L. 30, also provides for a school term of at least 180 days and for the teaching of a minimum of certain courses.

20. The State Council of Education prescribes certain subjects which must be taught in all schools located in Pennsylvania and Girard College complies with such minimum standards and submits a report to the Commonwealth that it has done so.

21. The Act provides for a certificate from any principal of a private school confirming that the work of the said school is in compliance with the provisions of the Act and the President of Girard College, in compliance with the Act, submits such a report and certificate.

22. The Legislature of Pennsylvania has enacted the Act of April 9, 1929, P.L. 177, as amended, 71 P.S. § 354(f) which provides in relevant part that the duty of the Department of Public Instruction shall be:

"(f) To determine and publish a standard high school course, to compile and cause to be published, from time to time, a list of elementary and secondary schools in this State, which conform to the official standards promulgated by the department, and take such steps as may be appropriate to raise the standard of elementary and secondary education."

23. Girard College conforms to the said official standards promulgated by the Department of Public Instruction and is included on the official list of schools so conforming.

24. The Act of March 10, 1949, P.L. 30, § 1332, 24 P.S. § 13–1332, requires every nonpublic school to report to a public school official instances of a pupil's missing three or more days of school and a pupil's leaving the school.

25. Pursuant to the above statute, Girard College files reports of pupil attendance with the division of pupil personnel of the Philadelphia School System and has done so for a number of years.

26. Upon request, Girard College supplies any public school district in the Commonwealth with lists of the names and residences of children enrolled in the College.

27. When it appears to the Department of Public Instruction that Girard College is not in conformity with the provisions of the Public School Act of 1949, it makes inquiry of the College concerning the matter and the College endeavors to explain its deviation.

28. Girard College has not only filed an annual report with the Department of Public Instruction since 1939, but receives from time to time additional instructions on the proper preparation of these reports, the type of data and the information required by the State.

29. A number of the forms supplied to Girard College by the Department of Public Instruction for the filing of its annual reports set forth the statutes under which the filing is required.

30. The said forms state:

"That the Department of Public Instruction has the power and the duty to publish a list of schools, elementary and secondary schools, which conform to the official standards promulgated by the Department." Act of April 9, 1929, P.L. 177, as amended, 71 P.S. § 354(f).

31. Certain of the annual forms provided by the Department of Public Instruction inquire as to whether the school is accredited by the Middle States Association of Colleges and Secondary Schools, and in 1962 Girard College informed the Department that they had been so accredited in that year.

32. In 1959 the President of Girard College informed the Department of Public Welfare that the College "reported to the Department of Public Instruction and * * * [was] subject to their jurisdiction. That preceded the Department of Public Welfare's." He further informed the said Department that Girard was "required" to "report" to and "be approved" by the Department of Public Instruction.

33. The trustees of Girard College file annually with the Pennsylvania Legislature a detailed report concerning the finances, student population and state of Girard College as required by the will of Stephen Girard.

34. The Attorney General of Pennsylvania has issued an opinion ruling that Girard College is under the supervision of the Pennsylvania Department of Public Welfare.

35. The said opinion states, as a power and duty of the Department of Public Welfare:

"To visit and inspect, at least once each year, all State and supervised institutions; to inquire and examine into their *methods of instruction* * * * [and other matters]."

36. Girard College has been visited by representatives of the Pennsylvania Department of Public Welfare on November 8, 1956, December 21, 1956, September 30, 1958, November 25, 1958, March 10, 1959, March 24, 1959, November 2, 1959, September 28, 1961, May 4, 1962, March 27, 1963 and June 3, 1964.

37. The Department of Public Welfare presently contemplates further inspection and reporting upon Girard College.

38. The Regulations of the Department of Public Welfare provide in part:

"When a full academic school program is operated within the institution, the educational program shall meet the requirements of the Department of Public Instruction in relation to the curriculum, qualifications of teaching staff, educational equipment and the physical facilities of the school rooms."

39. As a charitable educational institution, Girard College is subject to visitation and supervision by the Attorney General to ascertain that the charitable purposes of the trust are being carried out.

40. Girard College is an educational institution under the supervision of the Commonwealth.

41. Mr. Zarella, the College's Director of Admissions, has never had inquiries from mothers which suggested that they were sending their children to Girard College so that they could associate with certain individuals, or withdrawing their children so that they would not have to associate with certain persons.

42. There is no evidence that the defendants, mothers of students, or students are influenced by considerations of interpersonal associational preferences with

respect to admission to, enrollment in, or continuing attendance at Girard College.

43. The College and its alumni prepare and distribute to mothers, school principals, social workers and others, numerous informational brochures giving information about the College.

44. Some of these are promotional and soliciting in nature.

45. The College had prepared and circulated some 5,000 copies of a promotional leaflet in connection with its program of seeking new students in elementary schools outside Philadelphia.

46. Since 1955 some 30,000 brochures of various types describing Girard College and making its advantages known to prospective students have been prepared for the College.

47. The Director of Admissions and the President of the College both make numerous public talks concerning the College and hope that these will result in application to the College.

48. In 1944 Girard College advertised in a number of newspapers for new students.

49. In 1959 the Board of Trustees passed a formal resolution requesting the Director of Admissions of Girard College to make a survey of a number of elementary schools located outside the Philadelphia area in order to discover eligible new boys for enrollment at the College. This resolution was implemented.

50. None of the solicitation or recruitment is based, in whole or in part, on the desire or interest of potential applicants in the companionship of or preference for each other.

51. Girard College was not founded nor does it now exist for the purpose of serving the associational preferences of its students.

To the extent that they have not already been covered, we make the following rulings on plaintiffs' and defendants' requests for findings of fact:

Plaintiffs': Nos. 5, 7, 14(p) and 24 through 48 are *denied.*

Defendants': No. 6 is *affirmed,* but deemed irrelevant. Nos. 1 and 8 through 18 are *denied.*

## DISCUSSION

We need add little to the discussion in our opinion on the motion to dismiss as respects count three of the complaint. We there held that "if the individual plaintiffs can prove count three of their complaint, continued racial discrimination in the selection of students for admission to Girard College will be enjoined." Commonwealth of Pennsylvania et al. v. Brown et al., 260 F.Supp. 323, at page 357 (E.D.Pa., 1966). On the basis of the foregoing findings of fact, we hold that count three has been proven. However, in view of the nature of the proof and the arguments of counsel, a few additional observations are appropriate.

Defendants would have us hold that Girard College is not a "school" or "an educational institution" within the meaning of the Public Accommodations Act. The proof is entirely to the contrary.

It is true that the College may also serve as a home for its students, but its primary purpose is that of education. There is nothing in the statute which demands that a denominated public accommodation perform its public function exclusively. A drugstore (included as a public accommodation) may also be a bookstore, but it is no less a drugstore under the Act. Girard may be a home for orphans, but it is no less a school. Girard College is predominantly and incontrovertibly educational in conception and operation.

Defendants' argument that Girard is not "under the supervision of this Commonwealth" is equally without merit. See Commonwealth of Pennsylvania et al. v. Brown et al., supra, at p. 331. There is ample evidence of present regulatory control and supervision, both by the Department of Public Instruction and by the Department of Welfare, which has at least some concern and responsibility for the education of Girard stu-

dents. The Attorney General also has supervision over the College as a charitable educational institution. Defendants' cause is not helped by the fact that some of the supervision is by agencies of the Commonwealth other than the Department of Public Instruction. The language of the statute is extremely broad. The Legislature could have postulated "supervision of the Department of Public Instruction." It did not. It merely required that the institution be under the supervision of "this Commonwealth." Nor, for that matter, does the statute require any particular degree of supervisory control.

Defendants argue that many of the regulations and statutes which the Commonwealth has promulgated affect only the parents of schoolchildren, not the schools themselves, in that sanctions are visited upon the parents for failing to send their children to schools which comply with these requirements. But we are not concerned with the manner in which Pennsylvania's supervision is exercised; we have no doubt about the fact that the direct effect of these potential sanctions is to "supervise" the curricula, calendar, personnel, and other policies and activities of the schools themselves.

The evidence shows that Stephen Girard himself contemplated and, indeed, even encouraged the "supervision" of the Commonwealth. Surely, the reports to the legislature contemplated at least potential supervision. It should be emphasized that "supervision" may mean not only affirmative direction, but also a kind of paternalistic over-seeing, an effort to look out for the College's best interests.

█ Finally, defendants argue that Girard College is an institution or place of public accommodation which is in its nature "distinctly private," within the meaning of the Public Accommodations Act. In our first opinion, we discussed at length the meaning of the proviso. 260 F.Supp. at pp. 344 to 345. We there expressed the view that, with few exceptions, it would be difficult to conceive of a school which is in its nature distinctly private. Nonetheless, we adopted the

most liberal interpretation of the exclusionary clause to which defendants would be entitled for the purposes of testing whether Girard College could in any case be considered "distinctly private." We concluded that "[t]he exception * * * was carved out to protect the associational preferences of individuals where those preferences go to the *reasons for the institution's continuing existence* and where enforcement of the preferences is not likely to work a substantial interference with the equal opportunity goals of the main provisions." 323 F.Supp. p. 353 (Emphasis added).

We have afforded defendants every opportunity to present evidence which might sustain their contention that Girard College is "distinctly private" within the meaning which we assigned that term, but they have failed to rebut the ineluctable inference that "[a] school, such as Girard, does not have as its primary goal the furtherance of the private preferences of its students." Ibid. In fact, our conclusion is buttressed by the uncontroverted evidence that Girard College actively solicits—indeed, at one time, it even advertised—in order to attract the largest possible group of applicants who are interested in obtaining a fine education and upbringing. The test *under the statute* is not whether Stephen Girard preferred whites over Negroes; the test is whether his purpose was to establish a school whose primary function is not education, but association. We cannot believe that Stephen Girard, or the trustees who administer his will, or the students who attend his College have conceived of Girard College as an institution existing primarily, if at all, for the purpose of effectuating the personal ideas of its "scholars" as to whom they prefer to associate with.

As Girard himself so eloquently concluded: "My desire is, that all the instructors and teachers in the college shall take pains to instil into the minds of the scholars the purest principles of morality, so that, on their entrance into active life, they may, from inclination and habit, evince benevolence towards their

fellow creatures, and a love of truth, sobriety and industry * * *." (¶ XXI (9))

This adjudication, of course, reaches and disposes of finally only count three of the complaint. In our former opinion, we found it unnecessary to reach the merits of counts one and two. That is still the case, since plaintiffs have obtained the full relief they sought. However, we find it necessary to advert to counts one and two in order that the future course of this litigation, if future course there be, may be reasonably and expeditiously plotted.

We have summarized count two rather fully in our former opinion at 260 F. Supp. 323, pp. 330 to 331. Simply stated, it alleges that changed conditions in the City warrant a deviation from the literal white limitations of the will under the doctrine of *cy pres*. We held that we had pendant jurisdiction of that count. Curiously, while strenuously arguing our pendant jurisdiction, plaintiffs nevertheless suggested the possibility of abstention, a suggestion that defendants did not see fit to urge upon us. At that time, we concluded there was no reason for us to abstain. We now feel differently. In reaching this conclusion, we are moved by several considerations.

In connection with the pendant jurisdiction question, we noted that "the three counts of the complaint constitute a single 'case' for a single trial," and that "the proof required on the several counts is overlapping * * *." 260 F.Supp. at 335. We believed that a single trial would have disposed of the common issues of fact involved in all counts of the complaint. However, plaintiffs' insistence upon proceeding preliminarily (as it turned out, finally) on count three has made this an impossibility. The result reached here affords the plaintiffs the entire relief to which they would be entitled under any or all of the three counts. Therefore, it is not necessary for us to venture, at least at this time, into an adjudication of count two. Indeed, it might almost be presumptuous to do so. The Orphans' Court and the Pennsylvania Supreme Court are tutored in the interpretation of testamentary dispositions. It cannot be gainsaid that a federal court, while not completely devoid of testamentary experience, has been exposed to it to a much lesser degree. And, in fact, those Pennsylvania courts have had before them in the past this very will.

The construction of a will involves different considerations from the construction of a statute. The latter requires merely the utilization of accepted principles of statutory construction, applicable alike to a state statute or a federal statute. The former requires the invocation of law peculiarly state-oriented. Furthermore, while control over the trust res is not requisite to jurisdiction of an action to construe a will, Colton v. Colton, 127 U.S. 300, 8 S.Ct. 1164, 32 L.Ed. 138 (1888), it is the fact that the Orphans' Court does have control of the res and it is to that Court that the trustees must account.

For these reasons we have now concluded that it would be appropriate for us to exercise our discretionary authority to abstain as to count two. Plaintiffs are thus free to present to the Orphans' Court the contentions contained in count two. As we noted in our original opinion (323 F.Supp. p. 345, n. 16):

"Abstention possesses the additional virtue, in contrast to outright dismissal, that when the state courts pass on the state claims they must view them 'in light of the constitutional objections presented to the District Court', Government & Civic Employees Organizing Committee v. Windsor, 353 U.S. 364, 366, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957), even though the litigant need not present his federal claims to the state courts for decision but only to 'inform those courts what his federal claims are,' so that they may be seen in full context. England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 420, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). See also Martin v. Creasy, 360 U.S. 219, 225, 79 S.Ct. 1034, 3

L.Ed.2d 1186 (1959); Harrison v. NAACP, 360 U.S. 167, 177–178, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959)."

As to count one, it would at this juncture be an unjustifiable waste of judicial time to proceed to final hearing. If the disposition of the cause made here, now final and appealable, becomes the ultimate disposition, it is the end of the law suit. Additionally, the Pennsylvania courts may reach the same result under the doctrine of *cy pres*. In either event, it will become totally unnecessary to hear voluminous testimony or to decide in this case the frontier questions of constitutional law presented by count one. It seems to us that we should properly avoid both, if that is possible. We will not, then, set count one for final hearing at this time. However, should it become necessary to hear and decide count one, the parties are entitled to have that done with all reasonable speed. To this end, we will permit the parties to proceed as they see fit, subject to the control of the court, with such discovery as they deem necessary for the full presentation of their respective cases. In this way, the parties can be assured that no delay will be encountered if it becomes necessary to decide count one.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter, including pendant jurisdiction of counts two and three of the complaint.

2. The amount in controversy is in excess of Ten Thousand Dollars ($10,000), exclusive of interest and costs.

3. Girard College is a primary school, a secondary school, a high school, and an educational institution under the supervision of the Commonwealth and is not distinctly private in its nature within the meaning of the Pennsylvania Public Accommodations Act of June 11, 1935, P.L. 297, as amended by the Act of June 24, 1939, P.L. 872, 18 P.S. § 4654.

4. Girard College is covered by Sections (a) and (c) of said Act, and is not within the proviso of Section (d).

5. Said Act prohibits defendants from refusing plaintiffs admission to Girard College on the ground that they are not white, if they are otherwise qualified.

6. If plaintiffs are otherwise qualified for admission to Girard College, they may not be excluded on the basis of their race.

7. Plaintiffs are entitled to a permanent and final injunction, enjoining defendants from excluding them from Girard College solely on the basis of their race if they are otherwise qualified for admission.

8. This court should abstain as to count two of the complaint.

## DECREE

AND NOW, this 2d day of November 1966, it is ORDERED and DECREED that:

1. Defendants are permanently enjoined from denying to minor plaintiffs admission to Girard College on the sole ground that they are not white, provided that they are otherwise qualified for admission. The enforcement of this injunction is stayed until November 16, 1966 to afford defendants an opportunity to appeal to the Court of Appeals and to apply to that Court for such further stay as that Court deems proper, pending appeal.

2. Defendants shall proceed forthwith and without delay to complete all customary pre-admission procedures in connection with the minor plaintiffs' applications; to wit, all examinations, interviews, and pre-admission orientation. Defendants' motion for stay of execution of this part (2) of this decree is DENIED.

3. The court determines expressly that there is no just reason for delay and expressly directs the entry of final judgment for plaintiffs and against defendants on count three of the complaint.

4. Plaintiffs may institute an action in the Orphans' Court of the County of Philadelphia, in order that the courts of the Commonwealth of Pennsylvania may have due opportunity to decide promptly

and expeditiously all issues involved in count two of plaintiffs' complaint.

5. This court shall abstain from deciding count two of the complaint, but will retain jurisdiction over all allegations of the complaint, pending a final determination of plaintiffs' right to the relief granted in part (1) of this decree.