COMMONWEALTH OF PENNSYLVANIA, Attorney General of the Commonwealth of Pennsylvania, City of Philadelphia, and Alan Levi Bond, by his mother, Mrs. Ruby Bond, Charles William Hicks and Theodore Lewis Hicks, by their mother Mrs. Marie Hicks, James Scruggs and Henry Scruggs, by their mother, Mrs. Ardella Scruggs, and Tyrone Karl White and Terry Sherwood White, by their mother, Mrs. Charlotte L. White, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Revelle W. BROWN et al., Trustees of the Estate of Stephen Girard, Defendants.

No. 39404.

United States District Court
E. D. Pennsylvania.

July 5, 1967.

William T. Coleman, Jr., of Dilworth, Paxson, Kalish, Kohn & Dilks, Drinker Biddle & Reath, by Charles J. Biddle and Cuthbert H. Latta, J. Alan Kugle, Sp. Counsel, Philadelphia, Pa., for plaintiffs.

Edward G. Bauer, Jr., City Sol., Matthew W. Bullock, Jr., Deputy City Sol., Philadelphia, Pa., for City of Philadelphia.

Morgan, Lewis & Bockius, by Arthur Littleton, John Russell, Jr., Ernest R. vonStarck and Richard P. Brown, Jr., Thomas J. Gaffney, of Gaffney & Gaffney, Philadelphia, Pa., for defendants.

Harrison Kildare, of Rawle & Henderson, Philadelphia, Pa., William D. Valente, Villanova, Pa., Jerome J. Shestack, of Schnader, Harrison, Segal & Lewis, Murray H. Shusterman and Leon I. Mesirov, Philadelphia, Pa., for amici curiae.

## OPINION

JOSEPH S. LORD, III, District Judge.

This action [1] arises out of a claim by seven Negro male orphans, [2] the City of Philadelphia, the Commonwealth of Pennsylvania, and the Attorney General of Pennsylvania that the continued exclusion of non-white applicants to Girard College by the defendant Trustees is constitutionally impermissible under the Equal Protection Clause of the Fourteenth Amendment. We earlier determined that this Court has jurisdiction. This ruling was in no way disturbed by the Court of Appeals.

We now hold that the plaintiffs have sustained their burden of proving unconstitutional State action and that, accordingly, the relief requested must be granted.

1. For earlier proceedings, see, D.C., 260 F. Supp. 323; D.C., 260 F.Supp. 358, vacated, 3 Cir., 373 F.2d 771. Stephen Girard willed substantial property to the City of Philadelphia in trust to be used for the erection and operation of a primary and secondary boarding school for poor, male, white orphans. The school is known as Girard College. The individual plaintiffs seek admission although they are not white.

2. Under Pennsylvania law, an orphan need only be fatherless. Soohan v. City of Philadelphia, 33 Pa. 9 (1859).

Plaintiffs' primary contention [3] centers on the appointment by the Orphans' Court in 1957 of substitute trustees to administer Girard College. The constitutional question which is presented is both substantial and troublesome. The facts themselves are not in dispute. Stephen Girard appointed the City of Philadelphia to be trustee of the College established under the terms of his will. The trusteeship eventually passed to the Board of Directors of City Trusts, an agency of the City. In 1957, the United States Supreme Court held that thi· trusteeship constituted governmental discrimination barred by the Fourteenth Amendment. Com. of Pennsylvania v. Board of Directors of City Trusts, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957). The Supreme Court did not, however, order the admission of the Negro plaintiffs in that case to the College. Instead, it remanded "for further proceedings not inconsistent with this opinion."

In supposed conformity to that mandate, the Orphans' Court of Philadelphia County removed the Board of Directors of City Trusts as trustee and appointed private persons, styled "Trustees of the Estate of Stephen Girard." The sole function of these substitute trustees was and is to administer Girard College, and they have continued in force the discriminatory policies prescribed by the will. The Supreme Court of Pennsylvania held that the Orphans' Court had acted properly, both in light of the U. S. Supreme Court's mandate and State law. Girard College Trusteeship, 391 Pa. 434, 138 A.2d 844 (1958), appeal dismissed and cert. denied sub nom. Com. of Pennsylvania v. Board of Directors of City Trusts, 357 U.S. 570, 78 S.Ct. 1383, 2 L.Ed.2d 1546 (1958). Since the only way the testator's will, as interpreted by the State courts, could be effectuated was by the appointment of non-public trustees, the Orphans' Court action was obviously the only remaining alternative to the admission of non-white applicants to the College.

Plaintiffs rely on the Supreme Court's recent decision in Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). That decision is controlling in this case, and we believe that its proper application requires that we sustain plaintiffs' claims for relief. In *Evans*, the testator devised land to the City of Macon, Georgia, to be used as a park for white persons only. The City eventually decided that it could not constitutionally deny access to Negroes and it permitted the multiracial use of the facilities, even though this was clearly proscribed by the restrictive terms of the will. Thereafter, individual members of the Board of Managers of the park brought suit in the State courts, demanding the appointment of substitute "private" trustees who could administer the will as it was written. The City next resigned as trustee, and the Georgia court accepted this resignation and appointed new trustees. The Supreme Court of Georgia affirmed this action, holding that State law required the appointment of new trustees so that the restrictive purpose of the trust would not fail.

The United States Supreme Court reversed, emphasizing that, "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action. The action of a city in serving as trustee of property under a private will serving a segregated cause is an obvious example. See Com. of Pennsylvania v. Board of Directors of City Trusts, supra." 382 U.S. at 299, 86 S.Ct. at 488. Expand-

3. Plaintiffs' allegations with respect to the lease to the Philadelphia Community College of certain property owned by the Girard Estate are insubstantial. The proof is merely that the College benefits from the terms of the lease, which is the products of arms-length dealing between the Estate and the Community College. There is no evidence that a special advantage—intended or otherwise—was conferred on the College by the City of Philadelphia or its instrumentalities.

ing on this notion of "governmental character," the Court cited as other examples a privately owned and managed town, Marsh v. State of Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), and the elective process, Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). It is apparent that discrimination in these instances is *per se* constitutionally prohibited.

Apparently excluded from this *"per se"* category of quasi-public facilities are schools, for the Court was at pains to point out that, "If a testator wanted to leave a school or center for the use of one race only *and in no way implicated the State in the supervision, control, or management of that facility,* we assume arguendo that no constitutional difficulty would be encountered." 382 U.S. at 300, 86 S.Ct. at 489 (Emphasis added).

Of course, Stephen Girard, like the testator in *Evans,* did implicate the State in the administration of Girard College: the only questions are whether the College could have been and in fact was subsequently disassociated from the organs of State control, direction, and supervision, and whether, in consequence, the school was effectively cleansed of its "governmental character." Perhaps more to the point, the question is whether the State has purged itself of the discriminatory connection.

■ Plaintiffs, citing Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), contend that the appointment of substitute trustees by the Orphans' Court was unconstitutional *per se*. We do not agree. In *Shelley,* the Supreme Court held that a State court could not enforce a racially exclusive restrictive covenant which would have impeded a sale of property by one consenting party to another consenting party. The Court did not hold, as would have been analogous to the case before us, that a prospective purchaser of property can force the owner to sell to him when the latter wishes to adhere to a restrictive covenant which purports to bar such sales. On the contrary, the

Supreme Court stressed the fact that "the restrictive agreements standing alone cannot be regarded as violative of any rights guaranteed to petitioners by the Fourteenth Amendment. So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the Amendment have not been violated." 334 U.S. at 13, 68 S.Ct. at 842. The distinguishing feature of the *Shelley* case was that the State courts had undertaken to enforce the restrictive terms of the agreements in a situation where "petitioners were willing purchasers of properties upon which they desired to establish homes. The owners of the properties were willing sellers; and contracts of sale were accordingly consummated. It is clear that but for the active intervention of the state courts, supported by the full panoply of state power, petitioners would have been free to occupy the properties in question without restraint." 334 U.S. at 19, 68 S.Ct. at 845.

In the case before us, we find no consensual understanding among the parties; Stephen Girard did not provide for non-white male orphans and the trustees have refused to depart from the terms of the will.

■ All matters involving decedents' estates necessarily implicate the Orphans' Court, whose responsibility it is to effectuate the intent of the testator, to guard zealously against unwarrantable interferences with the testamentary property itself or the purposes to which the property has been pledged. Though a testator evidence the most blatant racial animus, the Orphans' Court, although admittedly an agency of the State, is duty bound to supervise his testamentary affairs as long as it does not directly associate or implicate itself in the discriminatory purpose.

■ The justification for this rule lies in the importance which our society attaches to a testator's will, to a man's right to dispose of his property in a man-

ner which conflicts with neither explicit federal nor state law at the time of the bequest or at the time of its subsequent administration. That justification is especially prominent where a charitable trust is involved. Pennsylvania has determined that the dominant intent of Stephen Girard was to benefit poor, male, white orphans. See Girard College Trusteeship, 391 Pa. 434, 138 A.2d 844 (1958). Such determination represents a matter of State law, completely within Pennsylvania's sphere, and one by which we are bound. Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In substituting new individual trustees in place of the City agency, the Orphans' Court was merely performing its traditional supervisory and administrative function of assuring the effectuation of the testator's intent as previously determined by Pennsylvania courts.

■ Mere supervision of and, if necessary, appointment of trustees by a probate court does not alone amount to a proscribed State entanglement. This is not to say that the nexus between the Trustees and the Orphans' Court is totally without significance, as we shall later point out. It is only to say that the substitution does not, in and of itself and standing alone, involve constitutional implications.

We are buttressed in our conclusion by the Court's studious avoidance in *Evans* of any reference to *Shelley*. By its silence, the Court seems to indicate that the mere substitution of trustees without more is not constitutionally objectionable. Something more is required; something which transforms the purportedly private activity into a public function. In *Evans*, it was the nature of the park as "an integral part of the City of Macon's activities" which worked the essential alchemy. "From the pleadings we assume it was swept, manicured, watered, patrolled, and maintain-

ed by the city as a public facility for whites only, as well as granted tax exemption * * *. The momentum it acquired as a public facility is certainly not dissipated ipso facto by the appointment of 'private' trustees." 382 U.S. at 301, 86 S.Ct. at 489. In effect, the openness of the park, its "public" facade and function rendered it public as a matter of constitutional law, in the absence of record proof of a "change in municipal maintenance and concern over this facility." Id. As the Court concluded, "We only hold that where the tradition of municipal control had become firmly established, we cannot take judicial notice that the mere substitution of trustees instantly transferred this park from the public to the private sector." Id.

*Evans* represents a rather new departure from existing theories of State action; its own theoretical basis is, unfortunately, somewhat obscure. In essence, *Evans* holds that where actual State operation has transformed a public service-type enterprise into a governmental function, or where state control has confirmed the fact of such a subsisting function, the subsequent transfer of operating responsibility to private hands will not necessarily terminate the impetus of State involvement. This formula makes sense in the *Evans* case itself, which concerned a quasi-public park, open without restriction to all white members of the community and from all appearances no different from any other city park except in respect to the racial limitation.[4] But it is impossible to assess the applicability of *Evans* to this case without first distilling some underlying principle from that opinion; mere factual comparison without philosophical foundation would be an exercise in futility.

■ We must start with the uncontrovertible proposition that private discrimination, however distasteful or invidious, is not prohibited by the consti-

4. Indeed, in view of the fact that the park was located in a Southern community, it may well have been that at one time all city parks were segregated, so that this park was exactly similar to every other park.

tutional strictures of equal protection. In re Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). However, if the State or agencies of the State actively engage in or even sponsor racial discrimination, the provisions of the Fourteenth Amendment are called into play. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). The doctrine of State action must be subject to reasonable limitations. Quite obviously, the influence and beneficial activities of the State permeate virtually every area of human endeavor. There are few respects indeed in which the impact of governmental effort and energy is not felt. In a sense, almost everything we do is in part the product of or is facilitated by some State action.

Thus, it is not enough to say that "State action" is prohibited. As the Court in *Evans* acknowledged, " * * * generalizations do not decide concrete cases. 'Only by sifting facts and weighing circumstances' (Burton v. Wilmington Parking Authority, supra, 365 U.S. [715] at 722, 81 S.Ct. 856, 6 L.Ed.2d 45 [(1961)] can we determine whether the reach of the Fourteenth Amendment extends to a particular case." 382 U.S. at 299–300, 86 S.Ct. at 489. Yet obviously some principles of general application must be formulated. It is in the creative endeavor to make those principles work that courts are continually called upon to test the validity of the underlying theses—and, in turn, are themselves tested.

The Supreme Court " * * * has never attempted the 'impossible task' of formulating an infallible test for determining whether the State 'in any of its manifestations' has become significantly involved in private discriminations." Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). However, the cases " * * * do illustrate the range of situations in which discriminatory state action has been identified. They do exemplify the necessity for a court to assess the potential impact of official action in determining whether the State has significantly involved itself with invidious discriminations." Id. at 1634.

The focus of our inquiry and, we believe, that of the Supreme Court, is *first,* the nature of the State involvement, and *second,* the nature of the institution concerned, be it park, school, or whatever. As we have already indicated, where the conscious *purpose* of the State action is to foster discrimination, the mere fact of such action requires constitutional sanctions. Thus, if the courts of Pennsylvania had acted to perpetuate discrimination at Girard College simply because it was their policy and purpose to foster racial segregation, without respect to the intent of the testator, we would have had little difficulty in disposing of this suit. But since that was not the case, we are required to make the two-fold inquiry implied by *Evans.*

The purpose of that inquiry is to ascertain whether the institution (here Girard College) is presently associated with the State in a manner which tends to suggest to the community that the institution's policy of racial discrimination is either practiced by or approved by public authority. This, we think, is the essence of Evans v. Newton. So, too, in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the governmental agency neither operated nor managed nor participated in the operation or management of the restaurant involved. Nevertheless, the Court held that the "State has so far insinuated itself" by the mere leasing of its property that discrimination was interdicted.

Far from abandoning the requirement of presently existing proscribed State action, those cases merely insist that we examine the whole course of conduct of the State with respect to the institution in question (including, of course, the appointment of substitute trustees) in order to determine whether the association has proved fatal to the discriminatory design and whether, in consequence, that design must now fail.

The quest is not for a scintilla of State action, for State action is ubiquitous and pervasive. The inquiry is properly directed to the type of State action involved, the extent to which the State thereby associates itself or is in the public view associated with invidious discriminatory purposes and policies, and, accordingly, the extent to which responsibility for the perpetuation of those invidious designs may be justifiably ascribed to the State itself.

The role of the court in evaluating these factors is a difficult one, but it is not unmanageable if the objectives remain clear. Whatever colorations the relevant factors may assume in the context of a particular case at a particular time, their significance may be properly focused by reference to the constitutional principles we have posited.

Much of the dissension within the Supreme Court itself as to the logical perimeters of the *Evans* decision can be explained by the absence of a full evidentiary record in that case. See the dissenting opinions of Mr. Justice Black and Mr. Justice Harlan. In effect, Mr. Justice Douglas, writing for the majority, found State action in the absence of record proof of disassociation from the public connections in the case of such an obviously public function as an open park, whereas Justices Black and Harlan stressed the necessity for affirmative record support of a continuing State involvement. In this litigation, we have the advantage of a full factual record to aid in our analysis of the relevant considerations to our decision.

We ask, *first,* what was and is the nature of the State involvement in Girard College? As in Evans, a city (later an agency of the city) was the named trustee of the institution. As such, it was responsible for the supervision, direction and control of the College. At that point, the State involvement was complete. Furthermore, it was an involvement of the most notorious nature; there are few citizens of Philadelphia who are not well-acquainted with the history of Girard College's steadfast intransigence to the demands of non-white applicants and the heavily publicized role which an agency of the City played in the denial of access to those applicants. Cf. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856 (1961); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627 (1967), supra.

Of course, the public trusteeship constituted nothing less than the active participation of the State in the very act of racial discrimination. Inevitably, the Supreme Court declared in the first Girard College Case that this conduct was State action prohibited by the Fourteenth Amendment.

After the removal of the Board of Directors of City Trusts and the appointment of substitute private trustees, the actual practice of discriminatory conduct by an acknowledged agency of the State ceased. However, the question further posed by *Evans* is whether the "momentum", if any, of 128 years of direct State involvement continues to brand discrimination at Girard College with the imprimatur of State approval. We think that it does.

There is no doubt in our mind that the substitution of trustees accorded with the Orphans' Court's understanding of the testamentary intent of Stephen Girard and involved, as such, no element of invidious discrimination on the part of that judicial body. However, that same court has exhibited a significantly different association with and concern for the Girard Estate from that evinced for other trusts. Thus, the formal Orphans' Court proceeding, initiated by that Court itself, in which the newly appointed Trustees were sworn to uphold Girard's will, suggested that the Orphans' Court had a very special interest in the all-white institution which transcended mere testamentary supervision. Likewise, the two visits of the Judges of the Orphans' Court to Girard College in 1959 and 1961 and the presentation to the Trustees on the latter occasion of certificates bearing the name of the Court and the appreciation of its members implied approval of defendants' dis-

criminatory conduct. In the same way, the fact that the trustees of this trust, as opposed to other charitable trusts, account to the Orphans' Court at regular intervals (as specified by the Court) and that the trustees may be removed and successors appointed at will by the Court affords the appearance of continuing interest in a trust which is, on its face, distinguishable from most other trusts only in its racial exclusivity.

■ We emphasize again that we do not in any manner mean to suggest that the Orphans' Court or any other State tribunal has consciously and purposefully promoted or sponsored the discriminatory design at Girard College. However, we must conclude that the City trusteeship—itself unconstitutional—and the ensuing attempt to alter the nature of that trusteeship—itself not unconstitutional—have resulted in the institutionalization of Girard College as a governmentally sanctioned center of racial bias. We hold only that in this case, the transfer of immediate supervisory control to private trustees by the Orphans' Court failed to effectively disassociate the State from the discriminatory policies and purposes which the State operation of the school had come to embody.

■ Moreover, there is not insubstantial evidence of subsisting connections between Girard College and agencies of the Commonwealth which afford further grounds for inferring a proscribed involvement in the discriminatory design. Thus, today as from the inception of the school's operation, regular reports to the State Legislature by the College regarding its activities continue to associate the State with the institution's discriminatory conduct. Defendants urge that this fact is irrelevant because the annual reports are not required by the State, but only by the will of Stephen Girard. This argument is plainly without merit, for indeed, the City trusteeship was of the testator's making as well. The first Girard College Case demonstrated that it matters not at all what the source of the tie between the State and the facility is. It is significant only that the involvement exists and that it lends sustenance, actual or apparent, to a policy of racial discrimination.

Surely, the fact that the State Legislature receives reports regarding the conduct of an institution of whose discriminatory operation it must be aware cannot be passed off as wholly irrelevant. If the testator required such reports, he must have contemplated at the very least potential supervision by the Legislature, not to mention the many benefits which might flow from this special relationship.

■ In addition, it must be noted that Girard College is subject to the general supervision of the State Department of Public Instruction, the State Department of Welfare, and other agencies concerned with the education and welfare of the young.[5] And it is undisputed that the College enjoys the substantial benefits of tax exemptions and other special concessions from public agencies. Of course, such controls and concessions constitute State action; the question is whether the State action is prohibited. We must conclude that, standing alone, the supervision which the State exercises over even private schools and the special benefits which it attaches to non-profit or charitable educational institutions do not involve prohibited State action per se.[6] But such factors are undeniably relevant in ascertaining whether the total State involvement is such as to afford to the practice of racial discrimination by a State-subsidized or supervised institution an aura of public approval and sanction. Cf. Eaton v. Grubbs, 329 F.2d 710, 713 (C.A.4, 1964)

■ In the context of this case, we must conclude that the advantages which Girard College derives from presently existing public services and supervision,

5. We discussed this supervision in some detail in another connection in our second opinion. D.C., 260 F.Supp. 358.

6. If the rule were otherwise, no privately endowed school could discriminate without constitutional consequences.

when coupled with the presence of additional instances of State involvement, have implicated the State in the discriminatory design. It is the quality of Girard's environment which the State superintends: yet that environment excludes a substantial segment of the State's population. It is the school's dedication to enlightenment which the State rewards: yet that enlightenment is tarnished by the pervasive effects of racial discrimination. The State, by approving the College as a fit place for the education and upbringing of young boys and by crowning that approval with the legislative grace of tax exemption, has in some measure aided an invidious discriminatory policy: that much is clear. When combined with the history of direct State operation and the not wholly unambiguous manner in which that control was sought to be terminated, we think the conclusion ineluctable that the College has not purged itself of critical State involvement nor has the State erased the impression of public approval which long attached to the school's racial policies.

We turn, then, to the *second* inquiry: What is the nature of the institution, here Girard College, in terms of the services it performs in the community?

In *Evans,* the Court's ultimate holding was "buttressed by the nature of the service rendered the community by a park. The service rendered even by a private park of this character is municipal in nature. It is open to every white person, there being no selective element other than race." 382 U.S. at 301, 86 S.Ct. at 490. Thus, partly as a result of the long period of State involvement and partly because of the inherent nature of the facility, the park was subject to the constitutional requirements of the Equal Protection Clause. However, the mere fact that the park performed a function which was also performed directly by municipal authorities was clearly deemed insufficient, standing alone, to sustain a constitutional claim. "The range of governmental activities is broad and varied, and the fact that govern-

ment has engaged in a particular activity does not necessarily mean that an individual entrepreneur or manager of the same kind of undertaking suffers the some constitutional inhibitions." 382 U.S. at 300, 86 S.Ct. at 489. The nature of the service is only one relevant factor to be considered.

Admittedly, the public character of the community services provided by the park in *Evans* was more obvious than those provided by Girard College. A park, open to the general public with the sole exception of non-whites, is the sort of facility which gives every appearance of State participation in or approval of the discriminatory design. There was nothing to distinguish this park from every other park in the community. Since other parks were operated by the municipality, the only reasonable inference was that this park too either was operated by the city or enjoyed the explicit approval of State agencies in its discriminatory operation. As such, it was "municipal in nature."

Here, the record establishes that Girard College was never a "public school" in the sense that it was ever administered by the Philadelphia Board of Education. However, unlike other "private" schools whose students can and do pay tuition, Girard undeniably performs a service to its students which would otherwise *have* to be performed by the public school system, since students at Girard are, by definition, unable to pay for education. In addition, there is substantial evidence of collaboration between the College and principals at various City public schools. Representatives of the College have maintained contacts with public school officials for the purpose of soliciting applications from students attending public schools who would be qualified to attend Girard College. Thus, it is a reasonable inference that public school authorities have referred potential applicants to an institution which they must have known engaged in racial discrimination. The effect of this aspect of the College's recruitment program has been to associate the institu-

tion with the City's educational system in a manner which could only evidence mutual respect and esteem. Thus, it appears that the College relies in part on the resources of the City schools, and the public schools look upon the College as an obvious agency to which to refer "qualified" students, who, by definition, must be "white."

The park in *Evans* was open to the public in general, there being "no selective element other than race." In this case, the relevant sector of the public to be considered is school-age male orphans, since as defendants have many times reminded us, Girard College is as much an orphanage as it is a school, with some two-thirds of its budget allocated to the care, as opposed to training, of its wards. By their very nature, orphanages are restricted to poor children. As to the sex limitation, it is commonly accepted for reasons of administrability as well as tradition in such institutions. Furthermore, the record reveals that the Trustees have pursued a continuing policy of vigorous recruitment of applicants, without regard to their background, social status, intelligence, religion, or any other factor which might limit the broad (if not heavily populated) class of poor male orphans, other than the factor of race. While all applicants are tested extensively, the important fact is that no initial application is discouraged, except those from Negroes; quite the contrary, every effort is made to attract as many potential applicants as possible.[7]

Thus, while Girard College is not a facility of general access to the public or even necessarily to the school-age population, it has always held itself out as an institution whose benefits are available to *any* needy, fatherless boy—as long as he is "white." In this sense, the College has become assimilated to a public boarding school or orphanage, "municipal in nature," the sole distinguishing feature of which at the present time is its racial restriction.

Surely, there is no question that State-sponsored racial inequality, as evidenced by State participation in or association with the discriminatory design, must be proscribed wherever it is found. On this, all of the parties to this litigation are wholly agreed. Sifting and weighing the factors of State involvement, we find it impossible to conceive that racial discrimination is constitutionally permissible at Girard College. The founder himself entwined the State in its administration, without even an articulated thought of some possible substitute. That entanglement persisted for over a century and a quarter. It was overtly removed by the unilateral action of a State agency, the Orphans' Court, which thereupon uniquely swore in the successors, binding them under State oath to carry out the founder's discriminatory policies,—and then officially thanked them for doing so. The State Legislature periodically receives reports, implicit in which is the perpetuation of discrimination. The Orphans' Court has demanded, uniquely as to this trust, periodic accountings and has, for all the record shows, accepted and approved them. Pennsylvania has overseen and approved both the education and upbringing of students at Girard College and the operation of the institution as a school and as an orphanage, serving an obviously public function. Recognizing the unavailability of an "infallible test," we nevertheless find it logically and legally impossible to escape the conclusion that racial exclusion at Girard College is so afflicted with State action, in its widened concept, that it cannot constitutionally endure. Since the strictures of the Fourteenth Amendment apply to the administration of the institution, it may no longer deny admission to applicants simply because they are not "white."

---

7. This recruitment effort, which at one time even included public advertising, was the subject of proof early in the case. See D.C., 260 F.Supp. 358. Significant-

ly, the intelligence of Girard College students is not exceptional, although the integrity and initiative of its graduates are unusual.

The foregoing shall be considered our findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a). In addition, the findings of fact in our opinion and decree of November 2, 1966 are reaffirmed. To the extent that they are relevant, the following requests of the parties for findings of fact are *granted*:

Plaintiffs' Nos. 1 through 5; 7 through 11–60; 11–62 through 11–68; 13; 16 through 23; 27; 28; 29; 31; 32; 40; 42; 43.

Defendants' Nos. 1 through 4; 9; 11; 12; 14 through 21; 23 through 34; 40 through 44.

The following requests for findings of fact are *denied*:

Plaintiffs' Nos. 11–61; 12; 14; 15; 24; 25; 26; 30; 33 through 38; 41.

Defendants' Nos. 5 through 8; 10; 13; 22; 35 through 39.

To the extent that the parties' requests for conclusions of law are consistent with the foregoing opinion, they are *granted*; to the extent that they are inconsistent, they are *denied*.

There being "no just reason for delay," F.R.Civ.P. 54(b), we direct the entry of judgment for plaintiffs on Count One, in accordance with the appended decree.

It is so ordered.

#### DECREE

And now, this 5th day of July, 1967, it is ordered and decreed that:

(1) This action shall be maintained as a class action under Federal Rule of Civil Procedure 23(b) (2). The class consists of all poor, male orphans who would be eligible for admission to Girard College except for the fact that they are not "white."

(2) Defendants are permanently enjoined from denying to members of the class [denominated in Paragraph (1) of this Decree] admission to Girard College on the sole ground that they are not white, provided that they are otherwise qualified for admission.

(3) The enforcement of this injunction is stayed pending application to and action by the Court of Appeals for such further stay as that Court deems proper, pending appeal.