The **CORPORATION OF HAVERFORD COLLEGE et al., Plaintiffs,**

v.

Kenneth R. **REEHER, individually and as Executive Director of the Pennsylvania Higher Education Assistance Agency, et al., Defendants.**

**Civ. A. No. 70–2411.**

United States District Court,
E. D. Pennsylvania.
July 19, 1971.

Lawrence Silver, Dilworth, Paxson, Kalish, Levy & Coleman, Louis M. Natali, Jr., Segal, Appel & Natali, Philadelphia, Pa., for plaintiffs.

John D. Killian, Killian & Gephart, Edward Friedman, Counsel Gen., Dept. of Justice, Harrisburg, Pa., J. Shane Creamer, Atty. Gen., for defendants.

Henry W. Sawyer, III, Philadelphia, Pa. (William A. Bradford, Jr., Washington, D. C., with him on brief), for United States National Student Association, Inc., amicus curiae.

Harris L. Wofford, Jr., Bryn Mawr, Pa., for twenty-eight colleges and universities, amicus curiae.

Howard Lesnick, Philadelphia, Pa. (Robert O'Neil, Berkeley, Cal., and Herman I. Orentlicher, Washington, D. C., with him on brief), for the American Association of University Professors, amicus curiae.

Before BIGGS, Circuit Judge, and LORD, and DITTER, District Judges.

## OPINION

JOSEPH S. LORD, III, District Judge.

Plaintiffs, two colleges and twelve college or university students, seek a declaratory judgment that two Pennsylvania statutes, 24 Pa.Stat.Ann. §§ 5104.1, 5158.2 (1971),[1] are unconstitutional and an injunction restraining officials of the Pennsylvania Higher Education Assistance Agency (PHEAA) from enforcing or otherwise acting under those statutes. This court has jurisdiction of the controversy pursuant to 28 U.S.C. §§ 1343, 2201, 2281, 2284, and 42 U.S.C. § 1983. The plaintiffs have moved for summary judgment on all issues of the statutes' unconstitutionality pursuant to Fed.R. Civ.P. 56.

 Plaintiffs seek to maintain this as a class action. Plaintiff Goddard College purports to represent 26 institutions which have refused to execute an agreement with PHEAA under the statute. We hold that this class is not so numerous that joinder is impracticable, Fed.R.Civ.P. 23(a), and thus Goddard shall not be treated as representative of a class for the purpose of this action. The other named plaintiffs meet the requirements of Rule 23,[2] and may main-

---

1. See Appendix A for text.

2. Plaintiff Isabel Paul has dropped out of school since the filing of this action. She alleges that she will be attending Drexel University in the Fall of 1971 and will be subject to being reported. She is not a student now, however, and thus is not presently affected by the statute. We hold that her complaint has been mooted and that no case or controversy exists between plaintiff Paul and defendants which would allow us to hear her complaint.

tain this as a class action. Haverford College represents that class of institutions which have executed reporting agreements with PHEAA in order to retain their status as "approved" institutions whose students will be eligible to receive state aid. Plaintiffs O'Shaughnessy, Hutchins, Levine, Goldman, Rabinowitz and Schaefer represent students who have lost their PHEAA loans or scholarships because they attend institutions which have refused to execute reporting agreements with PHEAA. Plaintiffs Goodwin, Sullivan and McLamb represent students at institutions signing a "Haverford" agreement[3] with PHEAA who, in order to get financial aid, must disclose in a supplemental form whether they fall within the provisions of subsections (a) (1), (a) (2) or (a) (3), must agree to inform PHEAA promptly if they act so as to fall within those subsections and must authorize their institutions to verify their answers if PHEAA so requests. Plaintiffs Ingram and Casnoff represent students at institutions signing "Haverford" agreements who refuse to execute such supplemental forms and thus have lost their eligibility for financial assistance.

The record before us consists of the complaint and answer, stipulations of fact agreed on by counsel, exhibits introduced into evidence by plaintiffs and evidence offered at a hearing on plaintiffs' motion for partial preliminary relief. The undisputed factual issues in the record are the bases for determination of the merits of plaintiffs' allegations that the statutes are unconstitutionally vague and overbroad and violate the First, Fourth, Fifth, Ninth and Tenth Amendments and the due process and equal protection clauses of the Fourteenth Amendment.

## I. ABSTENTION

Although neither party has raised the issue, we must consider whether we should abstain from any decision on grounds of vagueness or overbreadth in order to give the state courts an opportunity to construe the statute. This is not a case like Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), or Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971), where the Supreme Court held improper the issuance of injunctions by the Federal Court against state criminal proceedings. No state court proceedings exist relevant to this case.

■■ Abstention is an equitable doctrine. Younger v. Harris, *supra*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d at 675; Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 328, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964). In light of the legislative history of the statute and its section (c) saving clause which indicates an intent to permit only verbal expression of views, we do not consider the statute "obviously susceptible of a limiting construction." *See* Zwickler v. Koota, 389 U.S. 241, 251 n. 14, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967). Where plaintiffs justifiably claim that the statute is vague and overbroad, abstention can defeat the purposes of those doctrines, which exist at least in part to protect the cautious citizen who might be deterred from engaging in conduct which the state either could not or did not intend to punish. *See, e. g.,* Zwickler v. Koota, *supra,* at 252, 88 S.Ct. 391; Dombrowski v. Pfister, 380 U.S. 479, 486–487, 492, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Appropriate here are the Supreme Court's observations about abstention in the face of a vagueness challenge to a loyalty oath:

" * * * In these circumstances it is difficult to see how an abstract construction [by the state courts] of the challenged terms * * * in a declaratory judgment action could eliminate the vagueness from these terms. It is fictional to believe that anything less than extensive adjudications, un-

---

3. Under the Haverford agreement, an institution agrees to verify, if required by PHEAA to do so, to the extent of its knowledge, the answers given by students to questions asking whether they fall within the terms of subsections (a) (1), (a) (2) or (a) (3).

der the impact of a variety of factual situations, would bring the oath within the bounds of permissible constitutional certainty. Abstention does not require this." Baggett v. Bullitt, 377 U.S. 360, 378, 84 S.Ct. 1316, 1326, 12 L.Ed.2d 377 (1964).

The lengthy delay which would occur if we referred this case to the state courts would occasion an equally lengthy period of impingement on the rights plaintiffs seek to protect in this action, assuming their claims to be valid. In addition, our worries about possible friction with state officials arising from failure to abstain are mitigated somewhat by the fact that the attorneys representing the state agency have never raised the abstention issue. For these reasons, in the discretionary exercise of our equity powers, Baggett v. Bullitt, *supra,* at 375, 84 S.Ct. 1316, we decline to abstain from deciding the merits of plaintiffs' claims.

## II. VAGUENESS

Plaintiffs allege that subsections (a) (1), (a) (2) and (a) (3) of the two sections are unconstitutionally vague. They charge that the standards which govern PHEAA's eligibility determinations are so "vague that men of common intelligence must necessarily guess at [their] meaning" and therefore violate "the first essential of due process of law." Connally v. General Construction Co., 269 U. S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

While the *Connally* test has been articulated generally as the guide to judicial determinations of vagueness, its

mere recital followed by a conclusion that a statute is or is not unconstitutionally uncertain often produces seemingly inconsistent results[4] and provides little assistance to legislators concerned with drafting definite statutes. The only reasoned approach is to look at several factors which courts have considered important in relating the rationale for the doctrine to particular statutes. Some statutory definiteness is always necessary; but the pivotal decision as to the degree of certainty depends on several considerations:

(1) The nature of the rights threatened by the uncertainty;

(2) The probability that the threatened right actually will be infringed. This has been seen as a function of what sort of tribunal applies the allegedly uncertain standard;

(3) The potential deterrent effect of the risk of such infringement. This would largely be a function of the nature of the penalty imposed by the statute;

(4) The practical power of the federal courts to supervise the administration of the allegedly vague scheme; and

(5) The extent to which the subject area necessitates verbally imprecise regulation.[5]

The determination of what rights are threatened by the alleged uncertainties in these subsections can be made by asking what it is that students will avoid doing if they are unsure of the statute's meaning.[6] Under subsections

4. *See* Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa. L.Rev. 67, 70–72 n. 30 (1960) [hereinafter cited as The *Void-for-Vagueness* Doctrine].

5. These considerations were synthesized from many cases in the vagueness area. That synthesis relied extensively on The Void-for-Vagueness Doctrine, *supra,* at 94–96, and cases cited therein. See also Henkes v. Fisher, 314 F.Supp. 101, 107 (D.Mass.1970); Landry v. Daley, 280 F. Supp. 938, 952–953 (N.D.Ill.1968), rev'd on other grounds, sub nom. Boyle v.

Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971).

6. The importance of looking at the likely reactions of those subject to the statute was emphasized by the Supreme Court in Keyishian v. Board of Regents, 385 U.S. 589, 599, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967): "It is no answer to say that the statute would not be applied in such a case. We cannot gainsay the potential effect of this obscure wording on 'those with a conscientious and scrupulous regard for such undertakings'. Baggett v. Bullitt, 377 U.S. 360, 374 [84 S.Ct. 1316, 1323, 12 L.Ed.2d 377]."

(a) (2) and (a) (3), the student will attempt to avoid conduct which might be termed a disruption or disturbance of university activities. Certainly he would tend to avoid protests and demonstrations, many of which are protected activities under the First Amendment.[7] A higher degree of certainty is required if a statute has potentially inhibiting effects on free speech. NAACP v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed. 2d 405 (1963); Cramp v. Board of Public Instruction, 368 U.S. 278, 287, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); Smith v. California, 361 U.S. 147, 150–151, 80 S. Ct. 215, 4 L.Ed.2d 205 (1959). Under subsection (a) (1), the student will attempt to avoid any misdemeanor. The potential threat to First Amendment freedoms from vagueness there is thus less than in subsections (a) (2) and (a) (3).[8]

The probability that First Amendment rights will be infringed in some manner by (a) (2) and (a) (3) appears substantial. The uncertain standards are being applied in the first place by an administrative agency or even a university,[9] rather than by the state courts which can

be assumed to be more sensitive to the niceties of constitutional law.[10] PHEAA has broad discretion in applying the statute, partially because the legislature did not set many standards to guide its determinations. Where the legislature did set standards, such as its proscription in subsection (c) of both statutes that "nothing in this section shall be construed to limit the freedom of any student to verbal expression of individual views or opinions," its guidance could well suggest to PHEAA that it can punish non-verbal activities which the courts would protect under the Constitution. Finally, we take notice of the fact that many students have a penchant for participating in protests and demonstrations, just the sorts of activity most likely to be punished under the allegedly indefinite standards.

The potential deterrent effect of the supposed indefiniteness is likewise substantial. The parties here recognized that the potential deterrence will usually be a function of the penalty imposed by the statute, and insisted on arguing at length whether the statute was "penal." While courts have often regarded the

---

7. *See, e. g.,* Gregory v. Chicago, 394 U.S. 111, 112, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 152, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

8. The term in (a) (1) attacked for vagueness is "moral turpitude." Regardless of the meaning of that phrase, a student must be convicted of a misdemeanor before he can be denied eligibility, and he cannot be so convicted if he was engaging in protected First Amendment activity. Therefore, the uncertain standard cannot be used to reach protected activity. However, there is some connection between the vague phrase and infringement of First Amendment rights where a student is willing to run the risk that certain activity, such as demonstration, is a misdemeanor and that he may be fined or jailed for a short time, but is unwilling to take the chance that the activity involves "moral turpitude" because

he cannot afford to lose his financial aid. In such an instance, the uncertainty surrounding the term can deter the student from activity which may be constitutionally protected and in which he would have engaged had it not been for his fear that it might be classified as involving "moral turpitude."

9. Under (a) (2), the university decides whether the student should be expelled for refusal to obey a lawful regulation and whether that refusal contributed to a disruption. Defendant Reeher testified that PHEAA will withhold financial aid as soon as a student is reported by the university as falling within the terms of (a) (2). If the student is denied eligibility by a vote of the Board of Directors, he can appeal and the facts will be determined *de novo* at a hearing. However, Reeher's testimony made it clear that PHEAA will probably rely heavily on the university report for the evidence against the student on such an appeal.

10. *See* The Void-for-Vagueness Doctrine, *supra*, at 94 & n. 142.

civil-criminal distinction as critical in determining the required standard of certainty, *see, e. g.,* Winters v. New York, 333 U.S. 507, 515, 68 S.Ct. 665, 92 L.Ed. 840 (1948), we think the better view is that which finally bases that determination on the seriousness of what is at stake under the statutory scheme.[11] The Third Circuit has adopted the view of Soglin v. Kauffman, 295 F.Supp. 978, 988 (W.D.Wis.1968), aff'd 418 F.2d 163 (C.A.7, 1969), that expulsion or suspension from school "may well be, and often is in fact, a more severe sanction than a monetary fine or a relatively brief confinement imposed by a court in a criminal proceeding." Falcone v. Dantinne, 420 F.2d 1157, 1164 (C.A.3, 1969). The loss of financial aid eligibility may have an even more drastic effect than expulsion or suspension,[12] and its deterrent effect on students must be as great as that of many criminal statutes. At the same time, we must recognize that loss of financial aid does not carry the onus of a criminal conviction and may present only a financial hardship. We conclude therefore that the potential deterrent effect of the risk that exercise of protected activity will result in loss of financial aid is substantial; however, it is not so great as it would be if the threatened penalty were criminal conviction resulting in a multi-month imprisonment and/or a stiff fine.

Determination of the federal courts' supervisory power over the allegedly vague scheme's administration involves an attempt to estimate the abuses of constitutional rights which can be concealed in agency and/or state court fact-finding.[13] Under (a) (2) and (a) (3), fact determinations made by the university, which may not be required to give the student a hearing, heavily influence the initial and final fact determinations made by PHEAA. The right to cross-examine the witnesses against him in a PHEAA appellate hearing avails the student little when the evidence against him is a report from the university on his activities, as the testimony of Executive Director Reeher indicated would often be the case. PHEAA regulations which provide for a statement of the grounds for the initial denial of eligibility and for findings of fact if there is an appellate hearing make its decisions more susceptible to judicial review than if no reasons were given. However, while the hearing examiner must make findings of fact [14] and recommendations after a hearing, neither the Committee on Appeals which reviews his findings nor the Board of Directors who make the final decision on the appeal are required to state findings or give reasons supporting their decision. It is these factual determinations by PHEAA which will provide the framework for any constitutional challenge to the validity of the agency ruling.[15] Such determinations, which

---

11. The Supreme Court has indicated recently that the distinction between civil and criminal sanctions may have less vitality than it did at the time of *Winters, supra.* Without discussing that distinction, the Court voided for vagueness New York statutes which threatened public school teachers with loss of employment. Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). The Court stressed the danger of the uncertainty to protected First Amendment activity.

12. *See* p. 18, *infra.*

13. *See* The Void-for-Vagueness Doctrine, *supra,* at 80–81, 94.

14. This requirement is no guarantee that a reviewing court will have an adequate factual picture of what the student actually did. The findings of fact may consist only of the conclusion that there was a disruption and that the student contributed to it, the findings may include statements of only those facts which support the hearing examiner's conclusions, or the findings may consist of little more than a report of the evidence presented.

15. *See, e. g.,* Herndon v. Lowry, 301 U.S. 242, 263, 57 S.Ct. 732, 81 L.Ed. 1066 (1937); The Void-for-Vagueness Doctrine, *supra,* at 80 n. 72, 81 n. 74. The

are outside the control of the federal courts, may effectively doom a student to an adverse ruling on his claims[16] even if he does not get to the federal courts. Thus, federal court supervisory power over the allegedly vague scheme is curtailed in a significant fashion.

In determining the extent to which the subject area necessitates verbally imprecise regulation,[17] it seems most profitable to look at the ways in which states have regulated similar conduct. An obvious parallel exists between the conduct sought to be deterred by (a) (2) and (a) (3) and disorderly conduct or breach of the peace statutes. As the statute upheld by the Supreme Court in Zwicker v. Boll, 391 U.S. 353, 88 S.Ct. 1666, 20 L.Ed.2d 642 (1968), indicates,[18] the state can at least give some description of the conduct it condemns as well as of the consequence to society it seeks to avoid. It would be nearly impossible to itemize every form of conduct which might result in disruption of the peace of the university, but careful draftsmanship can make use of generic and modifying terms to delineate the sort of campus conduct that will not be permitted. It is also a simple matter for the legislature to include some intent requirement, such as the use of "maliciously or wilfully" which saved a Michigan anti-disorder statute from indefiniteness.[19] *See* McAlpine v. Reese, 309 F. Supp. 136, 139 (E.D.Mich.1970).

[redacted] In light of these five considerations, we conclude that a substantial potential threat to First Amendment freedoms would result from uncertainty in subsections (a) (2) and (a) (3), that control over the administration of the scheme by the federal courts is not such as would neutralize that possibility, and that the subject matter regulated does not necessitate vague standards of control which leave room for *ad hoc* decisions. Therefore, we will apply a strict standard of certainty to these subsections. Because of its more tenuous connection with First Amendment rights, subsection (a) (1) will be measured against less rigorous certainty requirements.

Agency obviously exercises much greater discretion in determining the factual issue whether a student contributed to a disruption than if the issue before them were whether the student had thrown a rock through a window. If the Agency finds that a student's acts contributed to a disruption, the courts have no way, short of *de novo* factual determinations, of determining the exact nature of the student's conduct. The parties have not indicated that facts would be determined *de novo* by a reviewing court. Even if they were, however, the time and cost involved in the student's thus securing judicial fact-finding which could cure defects in the agency's fact-finding might well be such that they would deter a student from engaging in conduct PHEAA might find to be a disruption.

16. For example, if a student claims his conduct was protected by the First Amendment from state interference, the judicial determination of the merits of his claim will depend in large measure on what his conduct actually was. If the agency factual determination binds the courts the student may be as effectively cut off from the protection of the courts as he would have been if no review were permitted.

17. Consideration of this factor in determining the degree of certainty required recognizes the recurrent idea in the law of vagueness that "the Constitution does not require impossible standards." United States v. Petrillo, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947); *see* The Void-for-Vagueness Doctrine, *supra*, at 95 & n. 150.

18. "Sec. 947.01. *Disorderly Conduct.*
Whoever does any of the following may be fined not more than $100 or imprisoned not more than 30 days:
(1) In a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly conduct under circumstances in which such conduct tends to cause or provoke a disturbance."

19. The Supreme Court, in Winters v. New York, 333 U.S. 507, 519, 68 S.Ct. 665, 92 L.Ed. 840 (1948), suggested that the presence or absence of an intent or purpose requirement should be a crucial factor in determining the definiteness of statutory language.

## A. *Subsection (a) (1)*

The allegedly vague segment of this subsection is that which allows PHEAA to deny aid to anyone convicted of a "misdemeanor involving moral turpitude." Defendants rely on the fact that the Supreme Court, in its only pronouncement on the subject, held that the phrase "crime involving moral turpitude" in the Immigration Act of 1917 was not unconstitutionally vague. Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951). That case is distinguishable from the instant controversy. The Court considered it "significant that the phrase has been part of the immigration laws for more than sixty years." *Id.* at 229, 71 S.Ct. at 707. The Court noted that no case had held the statutory phrase vague and that it had previously construed the phrase. *Id.* at 230, 71 S.Ct. 703. There is, of course, no such line of cases defining the term "misdemeanor involving moral turpitude" under this statute.[20] More significantly, the majority in *Jordan* seems to have considered the determinative issue to be whether "crime involving moral turpitude" was unconstitutionally uncertain in reference to a particular conviction.[21] In the case at bar, we must consider not whether plaintiffs would be aware that a particular crime involves "moral turpitude," but whether the plaintiffs will fairly be warned as to which misdemeanors involve moral turpitude and thus may occasion the additional sanction of loss of financial aid eligibility.

The different procedural posture of this case from *Jordan* requires us to take this different approach. *Cf.* Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1965); Baggett v. Bullitt, *supra.* We do not have before us an individual accused of violating a statute because he has engaged in certain conduct. Plaintiffs here challenge every aspect of the statute. They do not argue that the statute is so vague they could not have known it applied to a particular action. They argue instead that the statute is so vague that they do not know what actions are proscribed.

Our brother Ditter, in dissent, theorizes that if the term "misdemeanor involving moral turpitude" includes a class of crimes about which reasonable men could not differ, it cannot be held unconstitutional on vagueness grounds in this action. The Supreme Court, in *Keyishian,* held a statute prohibiting the utterance of any treasonable or seditious word or the doing of any treasonable or seditious act unconstitutionally vague when teachers to whom the act applied sought declaratory and injunctive relief.

---

20. Subsection (a) (1) includes offenses which "under the laws of the United States or Pennsylvania" constitute a misdemeanor involving moral turpitude. Our research has disclosed no Pennsylvania cases which define "moral turpitude" in other contexts in state statutes and which might be used to give content to the phrase. As far as we have been able to discover, federal law uses the term only in the immigration laws. 8 U.S.C. §§ 1182(a) (9), 1251(a) (4). We have found no support for the dicta in Heard v. Rizzo, 281 F.Supp. 720, 742 (E.D.Pa. 1968) that " * * * the Pennsylvania appellate courts have adopted the standard of 'moral turpitude' applied for many years by the federal courts in deportation proceedings. * * *"

21. The Court, after stating that a penalizing statute which failed to give due notice before an act is done that it will be penalized violates due process, said: "Whatever else the phrase 'crime involving moral turpitude' may mean in peripheral cases, the decided cases make it plain that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude. We have recently stated that doubt as to the adequacy of a standard in less obvious cases does not render that standard unconstitutional for vagueness * * *. But there is no such doubt present in this case. Fraud is the touchstone by which this case should be judged." 341 U.S. at 232, 71 S.Ct. at 708. *Cf.* Ramirez v. United States Immigration & Naturalization Service, 134 U.S.App.D.C. 131, 413 F.2d 405, cert. denied 396 U.S. 929, 90 S.Ct. 264, 24 L.Ed.2d 226 (1969). See also The Void-for-Vagueness Doctrine, *supra,* at 101 n. 179.

The Court conceded that some conduct clearly would be seditious, but emphasized: " * * * The crucial consideration is that no teacher can know just where the line is drawn between 'seditious' and nonseditious utterances and acts." 385 U.S. at 599, 87 S.Ct. at 681. *See also* Baggett v. Bullitt, *supra*, 377 U.S. at 369–370, 84 S.Ct. 1316, 12 L.Ed. 2d 377. In Coates v. Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), the Supreme Court held a statute unconstitutionally vague on its face even when it was attacked by defendants in a criminal prosecution, one of whom was a student who had been involved in a demonstration. The dissent argued much as the dissent here does, pointing out that "any man of average comprehension should know that some kinds of conduct" are covered by the ordinance. Even that minority view, however, recognized that a different approach is called for when the "statute at issue purports to regulate or proscribe rights of speech or press protected by the First Amendment." *Id.* at 619, 91 S.Ct. at 1691. The dissent conceded that in such cases involving First Amendment rights, a defendant could successfully challenge a statute as being unconstitutionally vague on its face, even if his conduct clearly was proscribed by the statute. *See also* Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

When we ask what moral turpitude means, we come up with the same answer as did Justices Jackson, Black and Frankfurter in their dissent in *Jordan*:

> " * * * If we go to the dictionaries, the last resort of the baffled judge, we learn little except that the expression is redundant, for turpitude alone means moral wickedness or depravity and moral turpitude seems to mean little more than morally immoral. * * * " (footnotes omitted) 341 U.S. at 234, 71 S.Ct. at 709.

They pointed out that the large number of lower court cases cited by the major-ity which had applied the phrase seemed capricious in their results [22] and then hit at the core of what we find most pernicious in this phrase:

> " * * * [I]t [the debate over the morality of some crimes] shows on what treacherous grounds we tread when we undertake to translate ethical concepts into legal ones, case by case. We usually end up by condemning all that we personally disapprove and for no better reason than that we disapprove it. * * * " *Id.* at 242, 71 S.Ct. at 713.

■ The term "moral turpitude" tells us very little about what misdemeanors trigger the loss of financial aid eligibility. Defense counsel at oral argument admitted he did not know what a "misdemeanor involving moral turpitude" was, but said the courts did. In what the parties term was an "authoritative declaration of the application of the statutes," PHEAA Executive Director Reeher replied to the question of a university official who asked the meaning of "misdemeanor involving moral turpitude":

> "This is a legal term which means that the misdemeanor is one which involves baseness, vileness or depravity in the private and social duties which a man owes his society. It is something immoral in itself, irrespective of the fact that it is punished by the law."

In essence, therefore, the legislature is saying that any immoral misdemeanor will subject the student to the extra sanction of loss of financial aid. If the state insists on legislating morality, we will insist at least that it spell out its moral code, particularly where those affected by the statute are of a different generation from the lawmakers and generally share a somewhat different outlook on what is and is not moral. The phrase "misdemeanor involving moral turpitude" is so vague it is unconstitutional.

---

22. 341 U.S. at 239 n. 13, 71 S.Ct. 703.

B. *Subsection (a) (2)*

This subsection provides:

"(a) The agency may deny all forms of financial assistance to any student:

"(2) Who has been expelled, dismissed or denied enrollment by an approved institution of higher learning for refusal to obey, after the effective date of this act, a lawful regulation or order of any institution of higher education, which refusal, in the opinion of the institution, contributed to a disruption of the activities, administration or classes of such institution;"

It is perfectly plain that the application of (a) (2) frequently will affect protected First Amendment activities, such as demonstrations and rallies. Subsection (a) (2) has no certainty at all. It is impossible for a student to know what an institution may consider to be a disruption, or whether a given course of conduct contributed to a disruption. No objective standards have been set forth to guide what is basically a subjective determination as to when an activity has been disrupted, or whether the student's conduct contributed to it.

Indeed, a Yale University administrator wrote PHEAA in March, 1970, and asked, among other questions, "Still in subparagraph a., by what standards is the determination to be made that a refusal contributed to a disruption?" In reply, Executive Director Reeher said:

"The determination of whether a refusal contributed to a disruption is to be made solely by the institution. * * PHEAA does not intend to issue standards for guidance of the institutions in this connection."

In a later answer to another inquiry asking whether PHEAA could be certain that universities would have and act under a standard definition of what constitutes "disruption of the activities, administration or classes of institutions" (sic), Reeher stated:

"The Agency hopes that all participants are familiar with the meaning of this phrase. However, if there is any doubt, if pertinent facts are forwarded to the Agency, we will make a determination * * *."

Nowhere did PHEAA indicate the standards it would use to determine whether a disruption had occurred.

The loss which a student might suffer from contributing to a "disruption" is substantial. The Third Circuit has recognized that expulsion or suspension from school "may well be, and often is in fact, a more sever sanction than a monetary fine or a relatively brief confinement imposed by a court in a criminal proceeding." Falcone v. Dantinne, 420 F.2d 1157, 1164 (C.A.3, 1969). Punishment under this statute may be more drastic. Scholarship assistance is awarded only where the student and his family have insufficient resources to meet educational costs at the institution of his choice. Forty per cent of scholarship recipients come from families with incomes of $8,000 or less. In its 1969–70 Annual Report, PHEAA said the purpose of this scholarship program was "to prevent 'tragic underdevelopment' of human talent by providing financial assistance to young people who might otherwise be denied the opportunity of a higher education." Praising the lending institutions which cooperate in PHEAA's guaranty program for loans up to $1500, PHEAA said, "Undoubtedly their spirit of service resulted in making it possible for several thousand students to begin or continue their postsecondary education." ANNUAL REPORT 18. Such facts and statements indicate that the loss of eligibility for financial aid may mean the end of college education for some students.

Thus, a heavy penalty of deprivation of financial aid eligibility rides on the university's interpretation of words without any guiding standard. The student could not possibly know what would be a disruption in the opinion of his school, an opinion which may vary widely from institution to institution and from time to time. Under the statute, the word "disruption" acquires only such meaning as any given institution may attach to it at any given time. The sub-

section cannot constitutionally stand in the face of such manifest indefiniteness.

### C. *Subsection (a) (3)*

The phrase attacked as unconstitutionally vague in this subsection is "any offense committed in the course of disturbing, interfering with or preventing * * *." This language has no special technical or common law meaning.[23] In fact, defendant's brief argues for the clarity of "disturbing" by equating it to "disorderly conduct" and proceeding to cite cases upholding the definiteness of the latter phrase. There is no intent or purpose requirement [24] such as that in McAlpine v. Reese, 309 F.Supp. 136 (E.D.Mich.1970) where the court found the terms "disturbance" and "diversion" sufficiently definite in a statute requiring that their making be wilful or malicious. In an ordinance with no such intent requirement, the court ruled that proscription of "making, aiding, countenancing or assisting in the making of a 'disturbance' * * *" was unconstitutionally vague. Landry v. Daley, 280 F.Supp. 968 (N.D.Ill.1968). The court focussed on the term "disturbance."

The term "interfering" was upheld against a challenge of vagueness by the Supreme Court where a statute prohibited "picketing * * * in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any * * * county * * * courthouses * * *." Cameron v. Johnson, 390 U.S. 611, 616, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 (1968). Unlike the phrase before us, that statute narrowly

delineated with what interference was prohibited and the terms "obstruct" and "unreasonably" in combination with "interfere" gave some idea of the limits of the word.[25] More recently, however, the term "interfere" has been held unconstitutionally uncertain when it appeared in less limiting contexts. In Landry v. Daley, 280 F.Supp. 968, 973, the court held unconstitutional an ordinance imposing a maximum $100 fine and reading in part, " * * * or shall in any way interfere with or hinder or prevent him [a policeman] from discharging his duty * * *," partially relying on the indefiniteness of "interfere." In Baxter v. Ellington, 318 F. Supp. 1079, 1086 (E.D.Tenn.1970), the court invalidated a statute on vagueness grounds proscribing any act which "interferes with, or tends to interfere with, the normal, orderly, peaceful, or efficient conduct of the activities of such campus * * *."

These considerations suggest that the terms "disturbing" and "interfering" may be unconstitutionally vague in themselves. We do not decide that issue, because we hold that these terms, in combination with the modifying phrase "in the course of" make the subsection unconstitutionally uncertain. A natural assumption might be that the legislature intended to reach offenses directly related to the "disturbance" or "interference" either as a cause or an element of the "disturbance." Yet, the language can rationally be read by the cautious student as reaching any offense, such as a traffic violation [26] or failure

---

23. In one of its many opinions dealing with vagueness, the Supreme Court suggested several factors which courts might consider in determining how definite statutory language was: (1) Whether intent or purpose was an element of the statutory violation; (2) Whether the challenged clause has any technical or common law meaning; and (3) Whether any light as to the clause's meaning can be gained from the section as a whole or from the section in which it appears. Winters v. New York, 333 U.S. 507, 519, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

24. See note 23, *supra*.

25. See note 23, *supra*.

26. That such minor law violations might be included in subsection (a) (3)'s prohibition is suggested by the use of "any offense" here, whereas subsection (a) (1) begins with the same language as (a) (3), with the exception that PHEAA's authority to deny aid is confined to conviction of a "a criminal offense." The PHEAA application forms for loan or scholarship aid instruct the applicant that he need not report juvenile offenses

to possess his draft card, which is only temporally related to this "disturbance." The phrase "in the course of" might apply to the planning stages for an event which "disturbs" university activities. We do not conclude that this phrase cannot constitutionally be used in statutes. We do conclude that when the phrase is used in this context, in combination with other indefinite terms, the subsection fails to satisfy the strict standard of constitutional certainty which is required here. Subsection (a) (3) is therefore unconstitutionally vague.

## III. OVERBREADTH

 Plaintiffs also attack subsections (a) (1) to (a) (3) as being unconstitutionally overbroad. The doctrine of overbreadth requires that "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." Zwickler v. Koota, *supra*, 389 U.S. at 250, 88 S.Ct. at 396; NAACP v. Alabama, 377 U.S. 288, 307, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964). In evaluating a statute's reach, we must consider its potential effects not just its proven effects. *See* NAACP v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); NAACP v. Alabama, 357 U.S. 449, 461, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The principle of overbreadth, like that of vagueness, shows the courts' concern that the threat of sanctions may deter the exercise of constitutional freedoms as potently as the actual application of sanctions. There-

fore, when First Amendment freedoms may be threatened, as is the case here, the government may regulate in the area "only with narrow specificity." NAACP v. Button, *supra*, 371 U.S. at 433, 83 S.Ct. 328.

 Subsection (a) (1) punishes only students who have committed certain crimes. Since criminal conduct is not protected by the Constitution, there is no overbreadth problem there.

 Subsection (a) (2) does present serious overbreadth problems. Since a private university is not bound by the Fourteenth Amendment to refrain from interfering with First Amendment freedoms,[27] a university regulation which prohibits a student from engaging in activities which would be constitutionally protected from state interference may be lawful. Similarly, the requirement that the student's conduct has contributed to a disruption of university activities, in the opinion of the institution, does not guarantee that the conduct will be constitutionally unprotected against state action.[28] Since the state cannot directly deny a student eligibility because of his exercise of First Amendment rights, *see, e. g.*, Speiser v. Randall, 357 U.S. 513, 518–519, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), it cannot do so indirectly by tagging that denial onto a determination by a university which is not bound to respect such rights. Therefore, regardless of whether (a) (2) is constitutional as applied to students expelled by universities subject to constitutional strictures against state action,[29] it is unconstitutionally overbroad

---

or minor traffic violations which resulted in a fine of less than $25.

27. *See, c. g.*, Coleman v. Wagner College, 429 F.2d 1120 (C.A.2, 1970); Browns v. Mitchell, 409 F.2d 593 (C.A. 10, 1969); Bright v. Isenbarger, 314 F. Supp. 1382 (N.D.Ind.1970); Commonwealth of Pa. v. Brown, 270 F.Supp. 782, 787–788 (E.D.Pa.1967).

28. *See, e. g.*, Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969), where a peaceful march caused a near riot, yet was held to be

protected by the First Amendment. We discussed above the vague nature of the term "disruption." The many different meanings which reasonably could be attached to that phrase leave substantial room for protected activity to be swept up in that categorized as contributing to a disruption.

29. We do not feel that subsection (a) (2) as it applies to students expelled from private universities is severable so that (a) (2) could remain in the statute to apply only to students expelled from uni-

in that it may sanction a student for engaging in constitutionally protected activity.

 Subsection (a) (3) presents a different problem. It is clear that the state could deny eligibility for financial aid to any student convicted of any offense. However, if a statute denied aid to any student who was convicted of any offense committed "in the course of protesting government policies," we would hold it unconstitutional, since it would obviously be an indirect attempt by the state to punish free speech. Plaintiffs allege that (a) (3) occupies the middle ground as a statute which may include free speech as a trigger for sanctions in addition to those imposed solely for the offense itself. Since the hazy terms "disturb" and "interfere" may naturally be construed to include various sorts of student activities which are constitutionally protected,[30] (a) (3) does permit the state to subject students to additional sanctions for an offense solely on the basis of First Amendment activity. The student is losing his financial aid eligibility under (a) (3) not because he committed an offense, as in (a) (1), but because the offense occurred "in the course of disturbing, inter-

fering with or preventing" orderly conduct of the university. The cautious student, well aware that he acts unwittingly in many ways which might be categorized as offenses (e. g., failure to carry his draft card, littering, etc.), will shy away from actions which might be characterized as disturbing or interfering with the orderly conduct of the university, and thus will be deterred from First Amendment activities which might fall within those descriptions. This is precisely the result against which the principle of overbreadth attempts to guard. *See* NAACP v. Button, *supra*, 371 U.S. at 433, 83 S.Ct. 328. Since subsection (a) (3) sweeps so broadly as to invade the area of protected First Amendment freedoms, it is unconstitutionally overbroad.

## IV. SECTION (b)

 We have decided that subsections (a) (2) and (a) (3) are unconstitutionally vague and overbroad and that the part of subsection (a) (1) which includes a "misdemeanor involving moral turpitude" is unconstitutionally vague. Since Pennsylvania law mandates the severability of this statute,[31] sections

---

versities required to abide by the Fourteenth Amendment. There is no indication in the language of the statute, nor in its legislative history or the history of PHEAA that would indicate the legislature would desire to differentiate between the classes of schools. *See* 46 Pa.Stat. Ann. § 555. Even if we were to find the applications of the subsection severable, it is not clear that it would be sufficiently narrow as applied to public universities. There have been indications that activity which would be protected against direct state interference by the First Amendment could be regulated by state universities in the name of university discipline. *See, e. g.,* Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 505, 507–509, 512–514, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Esteban v. Central Missouri State College, 415 F.2d 1077 (C.A.8, 1969) (Blackmun, J.).

30. *See, e. g.,* Gregory v. City of Chicago, *supra*; Shuttlesworth v. City of Birming-

ham, 394 U.S. 147, 152, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Davis v. Francois, 395 F.2d 730, 734 (C.A.5, 1968) ("[P]eaceful, orderly demonstrations cannot be restricted simply because they create disturbances * * * *").

31. Pennsylvania's statutory Construction Act states:

"The provisions of every law shall be severable. If any provision of a law is found by a court of record to be unconstitutional and void, the remaining provisions of the law shall, nevertheless, remain valid, unless the court finds the valid provisions of the law are so essentially and inseparably connected with, and so depend upon, the void provision, that it cannot be presumed the Legislature would have enacted the remaining valid provisions without the void ones; or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in

(b), (c) and (d) remain, as does a segment of section (a) of both statutes, which now reads:

"(a) The agency may deny all forms of financial assistance to any student: (1) Who is convicted by any court of record of a criminal offense which was committed after the effective date of this act which, under the laws of the United States or Pennsylvania, would constitute a felony."

We must therefore treat the plaintiffs' contention that section (b) violates the Fourth and Fifth Amendments and is unconstitutionally overbroad. Since the major part of section (a) has been stricken from the statute, all that the university must do under section (b) is furnish PHEAA with the name and address of any student of whom it has knowledge that he has been convicted of a felony.

 Plaintiffs claim that the reporting section violates the students' Fifth Amendment right not to incriminate themselves must fail. So long as subsections (a) (2) and (a) (3) have been stricken from the statute, the only "compelled" [32] authorization which the student gives the university is to forward information it has regarding his felony convictions to PHEAA. The institution, of course, may report such information whether the student authorizes it or not.

 Plaintiffs' allegations that section (b) compels an unconstitutional seizure of their papers and effects and that the subsection is overbroad cannot succeed on this motion for summary judgment because we do not have sufficient undisputed facts on which to base a legal judgment. *Cf.* 6 J. Moore, Federal Practice ¶ 56.16 (2d ed. 1966).

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures * * *." In our minds, resolution of plaintiffs' claims in this area turn on a determination of whether the seizure of the institution's records of a student compelled by the statute is reasonable. The Supreme Court has been particularly sensitive to the need to balance interests to determine the reasonableness of a search when the challenged search has not been of the usual sort involving police seizing evidence of crime. *See* Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408, 414–418 (1971); Camara v. Municipal Court, 387 U.S. 523, 536–538, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The Court in *Camara* centered its discussion of reasonableness around the issuance of a warrant for area inspections of dwellings and said:

"* * * Unfortunately, there can be no ready test for determining reasonableness [of a search] other than by balancing the need to search against the invasion which the search entails. * * *" 387 U.S. at 536–537, 87 S.Ct. at 1735

Given the state of the proof before us, we cannot make the balance necessary to determine the reasonableness of the search. We know that the invasion here is not so serious as the search of a home, but we have no proof as to the exact nature of the invasion.

More importantly, plaintiffs have argued that the state has no need to "search" for this information, since it has

---

accordance with the legislative intent." 46 Pa.Stat.Ann. § 555.
Legislative history and the content of the statute itself indicate that the legislature wanted students who had committed felonies to be reported to PHEAA. The statute is not as broad as it was with the unconstitutional provisions, but it stands independent and complete, makes sense and accords with legislative intent. The unconstitutional segments of

subsection (a) should thus be severed from the rest of the statute. *Cf.* State Board of Chiropractic Examiners v. Life Fellowship, 441 Pa. 293, 272 A.2d 478 (1971).

32. We express no opinion as to whether such authorization is "compelled" so as to invalidate it as a waiver of any Fifth Amendment rights.

superior alternative means for discovering any felony conviction. Plaintiffs have directed us to a statute, 28 U.S.C. § 534, which provides that the United States Attorney General shall collect crime and identification records and exchange them with authorized state officials. However, there is no evidence before us as to the extensiveness or general nature of any system which may have been established under that statute. Without facts sufficient to enable us to intelligently balance the governmental and private interests, we cannot determine the reasonableness of the alleged search and seizure and thus we must deny plaintiffs' motion for summary judgment on this issue.

The same lack of facts mandates the same result as to plaintiffs' allegation that section (b) is overbroad in that it chills their exercise of First Amendment freedoms. Plaintiffs argue that the requirement that the university report any student felony conviction within its knowledge means that all university personnel will have to report any student conviction of which they learn. This, they say, will "chill" the student-teacher associational relationship and curtail the free interchange of ideas in the academic community.

The Supreme Court has said, in assessing the constitutionality of another information-gathering scheme:

" * * * It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process *tends* to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication

of ideas, particularly in the academic community. * * * " Sweezy v. New Hampshire, 354 U.S. 234, 245, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (emphasis added).

As we indicated above in our discussion of overbreadth, and as *Sweezy* reiterates, we do not need proof of actual chilling effect in order to find a statute overbroad. However, we do not have in section (b) the same clear-cut impairment of free association or free speech that existed in cases such as Keyishian v. Board of Regents, *supra*, and Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), where the courts struck down statutes as overbroad because of their unmistakable tendency to chill. There is no such unmistakable tendency under section (b). Felony convictions are a matter of public record and the student must report any such convictions to PHEAA on his application for financial aid under penalty of another felony conviction. *See* 24 Pa.Stat.Ann. § 5104(9). Such outside pressures will markedly reduce the likelihood that a student will be trying to hide a felony conviction. While we can be relatively certain that those students who are hiding felony convictions will be deterred from discussing them, we cannot presume that this deterrence will carry over into discussions of other topics.[33]

■ Not only do we have difficulty on the state of the record before us estimating whether section (b) really does have any chilling effect, we have substantial difficulty estimating the government interest in acquiring information of felony convictions in this manner, for the reasons outlined above in our discussion of plaintiffs' Fourth Amendment claims.[34] Where there are

33. We realize that to require plaintiffs to prove directly that a student with an unreported felony conviction would be deterred from discussing other matters openly might be unreasonable, in that no such student will come forward to so testify when he could be charged with a felony for failure to report this on his PHEAA application. However, proof can be introduced by both parties which

would give us a better feel for the likelihood that some speech and association might be deterred by the statute. *Cf.* Kennedy v. Silas Mason Co., 334 U.S. 249, 256–257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).

34. An additional fact, not mentioned above, which further proof might clarify is the effectiveness of PHEAA's application

allegations that a statute is overbroad, we must be able to determine its probable deterrent effect on speech, association or other protected activities and we must be able to determine the government's interest in the intrusion which might justify that potential deterrence. *See* NAACP v. Alabama, 357 U.S. 449, 461, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); American Communications Ass'n, C. I. O. v. Douds, 339 U.S. 382, 399, 70 S.Ct. 674, 94 L.Ed. 925 (1950). We cannot make those necessary determinations on the basis of the facts before us and thus must deny plaintiffs' motion for summary judgment on this ground as well.

Plaintiffs' other contentions of unconstitutionality essentially are mooted by our decision that the major part of section (a) is unconstitutionally vague and overbroad. We therefore need not treat them here.

## APPENDIX A

"§ 5104.1 *Ineligibility for loan assistance*

(a) The agency may deny all forms of financial assistance to any student:

(1) Who is convicted by any court of record of a criminal offense which was committed after the effective date of this act which, under the laws of the United States or Pennsylvania, would constitute a misdemeanor involving moral turpitude or a felony; or

(2) Who has been expelled, dismissed or denied enrollment by an approved institution of higher learning for refusal to obey, after the effective date of this act, a lawful regulation or order of any institution of higher education, which refusal, in the opinion of the institution, contributed to a disruption of the activities, administration or classes of such institution; or

(3) Who has been convicted in any court of record of any offense committed in the course of disturbing, interfering with or preventing, or in an attempt to disturb, interfere with or prevent the orderly conduct of the activities, administration or classes of an institution of higher education.

(b) Each institution of higher education shall immediately furnish to the agency, the name and address of any student who is a resident of the Commonwealth of Pennsylvania who is expelled, dismissed or denied enrollment for the reasons set forth in clause (2) of subsection (a) of this section or of whom the institution of higher education has knowledge that he has been convicted of offenses as set forth in clauses (1) and (3) of subsection (a) of this section.

(c) Nothing in this section shall be construed to limit the freedom of any student to verbal expression of individual views or opinions.

(d) Any institution of higher learning which refuses to execute an agreement with the agency to comply with subsection (b) of this section shall be denied the status of an approved institution under the provisions of this act."

"§ 5158.2 *Denial of financial assistance*

(a) The agency may deny all forms of financial assistance to any student:

(1) Who is convicted by any court of record of a criminal offense which was committed after the effective date of this act which, under the laws of the United States or Pennsylvania, would constitute a misdemeanor involving moral turpitude or a felony; or

(2) Who has been expelled, dismissed or denied enrollment by an approved institution of higher learning for refusal to obey, after the effective date of this act, a lawful regulation or order of any institution of higher education, which refusal, in the opinion of the institution, contributed to a disruption of the activities, administration or classes of such institution; or

(3) Who has been convicted in any court of record of any offense committed

---

procedure in garnering information of all felony convictions of student applicants. If students rarely fail to list their convictions, this would reflect on the state's need to have the university report such information.

in the course of disturbing, interfering with or preventing, or in an attempt to disturb, interfere with or prevent the orderly conduct of the activities, administration or classes of an institution of higher education.

(b) Each institution of higher education shall immediately furnish to the agency, the name and address of any student who is a resident of the Commonwealth of Pennsylvania who is expelled, dismissed or denied enrollment for the reasons set forth in clause (2) of subsection (a) of this section, or of whom the institution of higher education has knowledge that he has been convicted of offenses as set forth in clauses (1) and (3) of subsection (a) of this section.

(c) Nothing in this section shall be construed as limiting or prejudicing the rights and prerogatives of any institution of higher education to institute and carry out an independent, disciplinary proceeding pursuant to existing authority, practice, and law, including but not limited to refusal to award, continue or extend any financial assistance to any individual because of any misconduct which in its judgment bears adversely on his fitness for such assistance, and further, nothing in this section shall be construed to limit the freedom of any student to verbal expression of individual views or opinions.

(d) Any institution of higher learning which refuses to execute an agreement with the agency to comply with subsection (b) of this section shall be denied the status of an approved institution under the provisions of this act."

24 Pa.Stat.Ann. § 5158.2, P.L. 383, § 2 (December 18, 1969), has been referred to throughout this litigation as 24 Pa. Stat.Ann. § 5158.1, which was the way it appeared in the 1970 pocket part of Purdon's Pennsylvania Statutes Annotated.

DITTER, District Judge (dissenting).

I respectfully dissent for the following reasons:

Statutes should be construed to uphold their constitutionality whenever possible. I question whether the majority has approached this case with that precept in mind.

This act is part of a legislative plan to support higher education by delegating powers to an administrative agency. It should not be interpreted as though it were a penal or licensing statute.

The concept of morality is not so vague that reference to a misdemeanor involving moral turpitude denies the protection of due process.

Language referring to disruption and the disturbance, interference with, or prevention of the orderly affairs of an institution of higher learning is not vague in context and when tested by the requirements of due process.

In considering overbreadth, the majority has adopted an overkill response which is unwarranted by the remote possibility of any chilling effect to First Amendment freedoms.

Finally, I believe that this statute is susceptible of a construction that would avoid any constitutional questions. I would therefore abstain from ruling upon it until after the issues here involved have been passed upon by the state courts.

I. *Statutes should be construed to uphold their constitutionality*

In this case, the majority completely overlooks the "cardinal principle" [1] that whenever possible, statutes should be construed so as to uphold their constitutionality: United States v. Vuitch, 402 U.S. 62, 91 S.Ct. 1294, 1298, 28 L.Ed.2d 601 (1971). This is equally true of state legislation, and the Supreme Court has frequently said that it will not assume in advance that a state will construe its laws so as to bring them into conflict with the

---

I. United States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 91 S.Ct. 1400, 1404, 28 L.Ed. 2d 822 (1971).

Federal Constitution: Local No. 8–6, Oil, Chemical and Atomic Workers International Union, AFL–CIO v. Missouri, 361 U.S. 363, 370, 80 S.Ct. 391, 396, 4 L.Ed. 2d 373 (1960).

Although a statute should not be invalidated on "slight implication" and "vague conjecture", Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960), the majority has taken just the opposite tack. It has stretched language, ignored context, and relied on whimsical hypotheticals to achieve its results.

## II. Act is part of a legislative plan to finance higher education, not a penal statute.

The majority opinion holds that subsections (a) (1), (a) (2), and (a) (3) are void because their terms are vague— so vague that they violate the due process clause of the Constitution.

In my judgment the basic mistake which the majority makes is to treat these subsections [2] as though they were criminal statutes, subject to a narrow, precise construction. Actually, they are no such thing. These subsections are part of a legislative plan to provide financial assistance for college students. A consideration of due process requirements begins with examining the exact nature of the government function involved as well as the private interest to be affected: Goldberg v. Kelly, 397 U.S. 254, 263, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970).

Pennsylvania's plan to help provide educational opportunities for its residents began in 1963 with a loan-guarantee program. This was expanded in 1966 to provide scholarship support to able, needy, capable, and deserving students.[3] Day to day operations of both programs are managed by a state agency, the Pennsylvania Higher Education Assist-

ance Agency, usually referred to as PHEAA.

As of September 25, 1970, PHEAA had made 80,599 scholarship awards for the 1970–71 academic year amounting to $49,627,840, and there had been 48,349 loans guaranteed totalling $54,384,270. Since the program's inception, 240,731 student loans amounting to $225,612,683 have been guaranteed. To guide PHEAA, the legislature created guidelines and standards. Thus, there are certain eligibility requirements, including citizenship, residency, educational attainment, continuity, and enrollment. The applicant must meet the qualifications of financial need, character and academic promise, as well as academic achievement, established by PHEAA.[4]

The statute provides that a scholarship recipient may attend any institution approved by PHEAA. Awards are to be made without regard to race, creed, color, sex, national origin, or ancestry, and the money may be used for tuition, room, board, books, and fees. A student may enroll in either a five-year work-study program or a four-year course. A student who is unable to demonstrate sufficient financial need in one year may apply in subsequent years. Provision is made for PHEAA to allocate funds by categories: one based on potential performance, another on need and actual performance, and a third on the degree of need. PHEAA is allowed discretion in the amount to be awarded to a student and may also adjust the time limits allowed for loan-repayments. The legislature realized that there might be fraudulent applications. It empowered PHEAA to investigate misrepresentations and provided criminal penalties.

Involved in this suit is another section enacted to guide PHEAA in the exercise of its discretion, a section which begins, "The agency *may* deny all forms

---

2. There are really two acts, but both have the same provisions. One refers to a loan guarantee plan and the other to a scholarship program.

3. Act of January 25, 1966, P.L. (1965) 1546, Section 1, 24 P.S. § 5151.

4. Act of January 25, 1966, P.L. (1965) 1546, Section 4, as amended, 24 P.S. § 5154.

of financial assistance * * * " (emphasis added). Plainly these are not words of proscription, but a grant of discretion. This is not a penal statute. There is no "prohibition"[5] in this section. There is no "heavy penalty"[6] and nothing which will of necessity "trigger"[7] the loss of financial aid. There is no "obvious parallel" between this statute and those which provide fines or jail for breach of the peace and disorderly conduct.[8]

Rather, the obvious parallel is to Title V of Public Law 90–575 enacted October 16, 1968, 20 U.S.C. § 1060. This act provides that for a period of two years a student shall receive no financial assistance from the federal government if he has been convicted of a crime involving force, disruption, or seizure of institution property so that officials or students are prevented from engaging in their duties or pursuing their studies. The same suspension is provided for students who wilfully refuse to obey a lawful regulation or order of an educational institution if such refusal is of a serious nature and contributes to a substantial disruption of the administration of the institution. It is apparent that the Pennsylvania legislature relied heavily on the prior Congressional enactment although it made the withholding of assistance discretionary rather than mandatory. Even the identical provision, "Nothing in this section shall be construed to limit the freedom of any student to verbal expression of individual views or opinions," is found in both statutes. Another parallel, but less obvious, is found in Public Law 89–358, enacted March 3, 1966, 38 U.S.C. § 1675. It provides that educational assistance for veterans shall be discontinued if there is unsatisfactory conduct based on *the regular standards and practices of* the institution.

· The words which this court says offend due process were intended to guide an administrative agency in determining whether tax dollars should be awarded to a particular student or made available to another student who would otherwise not receive assistance. These words are not penal in nature. The legislature of Pennsylvania demonstrated that it knew perfectly well how to enact penal legislation by doing so with regard to false applications and fraudulent pretenses. Penal statutes and those which make a direct attempt to limit or license the exercise of constitutional freedoms require greater precision than do the guidelines created by a legislative body for an administrative agency. Such legislation should be given a fair meaning, bearing in mind the purpose of the act: Black v. Magnolia Liquor Company, 355 U.S. 24, 26, 78 S.Ct. 106, 109, 2 L.Ed.2d 5 (1957). Courts should not assume that an administrative agency will exercise its discretion improperly: Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 46, 86 S.Ct. 1254, 1261–1262, 16 L.Ed.2d 336 (1966). The validity of delegated discretionary powers does not rest upon the enumeration of precise standards or specific guiding factors: United States v. Baker, 429 F.2d 1344, 1347 (7th Cir., 1970).

PHEAA must dispense millions of dollars of taxpayer's money and choose which among thousands of applicants are "deserving" and which are most likely to help the Commonwealth of Pennsylvania "achieve its full economic and social potential" because they are persons of "character". Viewed as a part of a legislative plan to allocate state money, the subsections in question do not offend the requirements of due process.

### III. *The concept of morality is not vague.*

In reaching its decision that almost all of subsection (a) is unconstitutionally vague, the majority considers the various terms in each subparagraph:

---

5. See majority opinion, page 1208, footnote 26.

6. See pages 1207–1208. Compare analysis, p. 1203.

7. See page 1206.

8. See page 1204.

"moral turpitude", "disruption", and "disturbing, interfering with or preventing."

The first to be analyzed is "moral turpitude," which is used in the context,

The agency *may* deny all forms of financial assistance to any student:

1. Who is convicted by any court of record of a criminal offense * * which, under the laws of the United States or Pennsylvania, would constitute a *misdemeanor involving moral turpitude* * * * " (emphasis added)

The majority correctly interprets the words "misdemeanor involving moral turpitude" to mean a misdemeanor involving immorality, but then says that the concept of immorality is not one that has the precision which due process requires.

No cases are cited for this holding. Instead, reliance is placed on the dissent in Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951), a case involving the deportation of an alien. The precise ruling in Jordan, however, was that the term "moral turpitude" was not vague and that its use in the Immigration Act did not offend constitutional requirements. In Ramirez v. United States Immigration and Naturalization Service, 134 U.S.App.D.C. 131, 413 F.2d 405 (1969), the Court of Appeals for the District of Columbia held that any challenge to the term "moral turpitude" on the grounds of vagueness was foreclosed by Jordan. The Supreme Court denied certiorari: 396 U.S. 929, 90 S.Ct. 264, 24 L.Ed.2d 226 (1969).

In Jordan, it was observed that "moral turpitude" has deep roots in the law, has been interpreted in a variety of factual situations, and has long been part of the statutory language of the United States.

In explaining its holding, the Court also said:

We have several times held that difficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness. * * * Impossible standards of specificity are not required. * * * The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. * * *

We conclude that this test has been satisfied here. Whatever else the phrase 'crime involving moral turpitude' may mean in peripheral cases, the decided cases make it plain that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude. We have recently stated that doubt as to the adequacy of a standard in less obvious cases does not render that standard unconstitutional for vagueness. * * *

The term "moral turpitude" was used at common law and has been used in statutes enacted by many of the states. There are a glut of decisions on the subject.[9] Although some inconsistencies appear in marginal areas, the sheer weight of cases lends certainty as to many offenses. A random sampling shows that abortion, adultery, conspiracy, embezzlement, extortion, fraud, keeping a disorderly house, larceny, receiving stolen property, tax evasion, and the use of the mails to defraud have been always held to be offenses involving moral turpitude. On the other hand, carrying a concealed deadly weapon and drunken driving have been held not to be.

Of course, we are only concerned with those offenses which would constitute misdemeanors involving moral turpitude under the laws of the United States or

9. Words and Phrases require more than 22 pages, plus its pocket parts, to list the cases defining the term—and there are cross references to additional uses of the words.

Pennsylvania. Pennsylvania, like many other states, has legislated in the field of morals through both criminal [10] and licensing laws. The courts of Pennsylvania have found these laws to be constitutional, despite the attack that they were vague. This court has agreed, and the Supreme Court has denied certiorari or affirmed per curiam.

For example, the Act of June 3, 1953, P.L. 277, 18 P.S. § 4532, makes it a misdemeanor to corrupt the morals of any child. In Commonwealth v. Randall, 183 Pa.Super. 603, 133 A.2d 276 (1957), the Superior Court, citing Jordan, rejected the argument that the word "morals" had no definite and well-settled meaning. The Supreme Court of the United States denied certiorari, 355 U.S. 954, 78 S.Ct. 539, 2 L.Ed.2d 530 (1958). More recently in Heard v. Rizzo, 281 F. Supp. 720, 741–742 (1968), a three-judge panel of this court referred to Randall as a "landmark case," noted references to "generally accepted moral standards of the community" and "common standards of morality," and said, "The Pennsylvania Superior Court in *Randall* concluded that the 'Corrupting the Morals of a Minor' statute was sufficiently clear and definite to meet the test of constitutionality. We agree in view of the above interpretation of this statute by the Pennsylvania courts." This case was affirmed per curiam by the Supreme Court, 392 U.S. 646, 88 S.Ct. 2307, 20 L.Ed.2d 1358 (1968).

Section 493 of the Pennsylvania Liquor Code, the Act of April 12, 1951, P.L. 90, 47 P.S. § 4–493 prohibits "lewd, immoral,

or improper entertainment" in establishments licensed by the Pennsylvania Liquor Control Board. In Tahiti Bar, Inc. Liquor License Case, 395 Pa. 355, 150 A.2d 112 (1959), it was held that these terms were not too vague to satisfy the requirements of the Fourteenth Amendment. An appeal to the Supreme Court of the United States was dismissed for want of a substantial federal question, 361 U.S. 85, 80 S.Ct. 159, 4 L.Ed.2d 116 (1959).

Congress has also legislated in the field of morality,[11] even to the extent of making it unlawful to place indecent or immoral materials on tobacco packages.[12]

In view of the many state cases, the Supreme Court's holding in Jordan, its recent refusal of certiorari in Ramirez, the appellate rulings by Pennsylvania in Randall and Tahiti, the Supreme Court's refusal of certiorari in both, our holding in Heard and the Supreme Court's per curiam affirmance of that case, I am hard put to understand how the majority can say that the term "moral turpitude" is vague under the laws of the United States or Pennsylvania.

If we assume for the sake of argument, however, that there might be a question about whether some misdemeanor involves immorality or not, it does not follow that the subsection here questioned is unconstitutional. As set forth in Jordan v. De George, supra,

> We have several times held that difficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically

10. Article V, Pennsylvania's Penal Code of 1939, the Act of June 24, 1939, P.L. 872, 18 P.S. § 4501, etc., is entitled *Offenses Against Public Morals and Decency.* Included are 32 crimes, some of which are felonies and some of which are misdemeanors.

11. It is a crime to transport a woman, coerce a woman, or coerce a minor to go from place to place in Interstate Commerce for prostitution, debauchery, or other immoral practice: 18 U.S.C. §§ 2421, 2422, and 2423. There are statutes on obscenity: 18 U.S.C. §§ 1461, 1462,

1463, 1464, and 1465. It is a crime to import immoral articles into the United States: 19 U.S.C. § 1305. The constitutionality of this statute was recently upheld in United States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971). Aliens who have been convicted of a crime involving moral turpitude before admission shall be excluded from the United States, 8 U.S.C. § 1182(a) (9) or may be deported for committing such a crime after admission, 8 U.S.C. § 1251(4).

12. 26 U.S.C. § 5723(e).

render a statute unconstitutional for indefiniteness. * * *

More recently, the same idea has been expressed in a concurring opinion in United States v. Vuitch, supra. There, a doctor was charged with violating a District of Columbia statute which makes abortion a crime unless "the same were done as necessary for the preservation of the mother's life or health." The District Court, 305 F.Supp. 1032, dismissed the indictment on the grounds that the word "health" was unconstitutionally vague. The Supreme Court reversed, holding the word has been and should be interpreted to refer to both psychological and physical well-being, that physicians routinely are called upon to make decisions concerning a patient's health, and that the term was therefore not vague. In concurring, Mr. Justice White pointed out no one of average intelligence could believe that under the statute abortions *not* dictated by health considerations were legal. Thus, even if the term "health" was unconstitutionally vague, the statute would not be void on is face because it reaches a class of cases in which the meaning of "health" is irrelevant, cases in which no possible vagueness problem could arise. He concluded that in the absence of a factual record, the claim of vagueness should be dismissed.

Subsection (a) (1) reaches a class of cases about which persons of reasonable intelligence could not differ.[13] Therefore, in the vast majority there will be no possible vagueness, and this subsection should only be held unconstitutional on the basis of some factual application.

IV. *"Disruption" is not a vague term.*

Subsection (a) (2) provides that PHEAA *may* deny financial assistance to any student who has been expelled for refusal to obey "a lawful regulation or order of any institution of higher education, which refusal, in the opinion on the institution, contributed to a disruption of the activities, administration or classes of such institution."

The majority says that (a) (2) is vague because a student will have no way to know what an institution may consider to be a disruption or whether a given course of conduct contributed to a disruption. In addition, the majority states:

"It is perfectly plain that the application of (a) (2) frequently will affect protected First Amendment activities, such as demonstrations and rallies."

Here the majority puts a rabbit into the hat.

While it is true that all First Amendment rights occupy a favored status and that demonstrations and rallies are frequently the forum in which those rights are exercised, the Supreme Court has made it perfectly clear that demonstrations and rallies are not in themselves protected activities: Barker v. Hardway, 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217 (1969).

There is no constitutional right to hold a demonstration near a court house in violation of a statute which proscribes conduct designed to interfere with the administration of justice: Cox v. State of Louisiana, 379 U.S. 559, 562–563, 85 S.Ct. 476, 479–480, 13 L.Ed.2d 487 (1965). Picketing and parading are subject to regulation even though intertwined with expression and association: Cameron v. Johnson, 390 U.S. 611, 617, 88 S.Ct. 1335, 1358, 20 L.Ed.2d 182 (1968).

A demonstration does not throw a cloak of immunity around illegal activity. In United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the defendant was convicted for burning his draft card during a demonstration against the war in Vietnam. Chief Justice Warren pointed out, "This Court has held that when 'speech' and 'non-speech' elements are combined in the same course of conduct, a sufficiently

---

13. For example, a conviction for corrupting the morals of a child under Pennsylvania law.

important governmental interest regulating the non-speech element can justify incidental limitations on First Amendment freedoms."

Not all conduct intended to communicate an idea is protected by the Constitution. A speaker may not incite a crowd to riot: Feiner v. New York, 340 U.S. 315, 321, 71 S.Ct. 303, 306, 95 L.Ed. 295 (1951). Abusive epithets, the so-called "fighting words", are not within the protection of the Constitution: Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Obscenity is not: United States v. Thirty-Seven (37) Photographs, supra.

Subsection (a) (2) is not aimed at demonstrations, rallies or free speech. It is aimed at those who would disrupt the educational process for others, those who would drown out, throw out, or burn out. " * * * conduct by the student * * * which for any reason * * * materially *disrupts* class work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969). (emphasis added)

Subsection (c) of this statute provides, "Nothing in this section shall be construed to limit the freedom of any student to verbal expression of individual views or opinions." Therefore, the only inhibition to First Amendment freedoms —if any—from subsection (a) (2) are those which transcend the written and spoken word. Subsection (a) (2) informs a student that if he *disrupts* (the word that is used in Tinker) by conduct which goes beyond verbal expression the activities of the institution which he has chosen to attend to the extent that it expels him, he *may* lose his financial support from Pennsylvania. There is nothing vague about expulsion from college. It is definite, drastic, and final.

Most institutions of higher learning have published rules and regulations which will provide a prospective student with a basis for judging the limits of acceptable conduct. To be significant so far as PHEAA is concerned, expulsion must be "lawful." Among other things, that means that the institution must have followed its own procedures of which the student has full notice.

To expel or not to expel may require a certain amount of subjective judgment on the part of the institution. Subjective decisions, however, have always been the stuff of education. Based on institutional decisions which have no objective standards, some men become artists, while others are directed to commerce or even the law. Disciplinary discretion, that is, the power to decide when activities have been so disrupted that expulsion is warranted, does not seem beyond foreseeable expertise or basic fairness.

So far as six separate federal student assistance programs are concerned,[14] Congress has made the educational institution the sole judge of acceptable conduct and behavior. I agree that to do so is logical. I believe that the institution's decisions in a high majority of cases will be fair, just, and in accordance with the standards of due process. I would hold that subsection (a) (2) is not facially void. If it is ever applied in an unconstitutional way by PHEAA, a reviewing court can correct the administrative error.

V. *"Disturb, interfere with or prevent" are not vague when used in reference to orderly conduct of affairs of institutions of higher education.*

Subsection (a) (3) provides that PHEAA may deny financial assistance to any student "who has been convicted in any court of record of any offense committed in the course of disturbing, interfering with or preventing * * * the orderly conduct of the activities, admin-

14. 20 U.S.C. § 1060 and 38 U.S.C. § 1675.

istration or classes of an institution of higher education."

The majority holds that the phrase "any offense committed in the course of disturbing, interfering with or preventing * * *" is unconstitutionally vague because the language has no special technical or common law meaning. However, the operative words have frequently been construed individually or in other combinations.

"Disturb" means to throw into disorder or confusion: State v. McNair, 178 Neb. 763, 135 N.W.2d 463, 465 (1965). It means to distract, to interfere with the lawful enjoyment of a right. It is a word of common meaning: State v. Davis, 21 Ohio App.2d 261, 257 N.E.2d 79, 81 (1969). The words "interrupt and disturb" have been held not to be unconstitutionally vague. When used in conjunction with activities at a school, they warn a person of ordinary intelligence against substantially interfering with its operation and program: State v. Wiggins, 272 N.C. 147, 158 S.E.2d 37, 42 (1967), cert. denied, 390 U.S. 1028, 88 S.Ct. 1418, 20 L.Ed.2d 285 (1968).

In McAlpine v. Reese, 309 F.Supp. 136 (E.D.Mich.1970) [15] an ordinance prohibited wilfully and maliciously making any noise, disturbance, or improper diversion of school activities. The Court held that disturbance was not a vague word and that like every other term, it gained meaning from context, association and commonly understood usage.

In Cox v. State of Louisiana, supra, the Supreme Court approved as "precise" and "narrowly drawn" a statute which made it an offense to parade or picket with the intent of *interfering with*, obstructing, or impeding the administration of justice. This same language is used in an act referring to the federal judiciary, 18 U.S.C. § 1507, and a similar law has been adopted in Pennsylvania, the Act of June 24, 1939, P.L. 872, as amended, 18 P.S. § 4327.

The word "interfere" is also used in another federal statute, 29 U.S.C. § 158 (a) (1), referring to unfair labor practices. In that context it has been held to mean to come in collision, to clash, to be in opposition, or to run at cross purposes: NLRB v. Exchange Parts Company, 304 F.2d 368, 374 (5th Cir. 1962).

In Coppedge v. Franklin County Board of Education, 273 F.Supp. 289 (E.D.N. Car.1967), the Court stated appropriate steps should be taken to prevent interference with its order, explaining there was to be no "harassment, intimidation, threats, hostile words or acts, and similar behavior."

People v. Del Toro, 155 Colo. 487, 395 P.2d 357 (1964), holds that "interfere" is not a vague and uncertain term but is well-defined and generally understood.

The word "prevent" means to hinder, impede, keep from, frustrate, stop, check, thwart or keep from happening or existing: Walker v. Equitable Life Assurance Society of U. S., 123 F.Supp. 306, 308 (E.D.Ill.1954). It is a word of common understanding: International Parts Corporation v. Federal Trade Commission, 133 F.2d 883, 886 (7th Cir. 1943).

In the context of (a) (3), these three words, disturbing, interfering, and preventing, gain certainty from their use with each other, from their connection to a conviction in a court of record, and from their reference to the "orderly" conduct of the activities, administration, or classes of an institution of higher education. Unfortunately, the majority overlooks all that precedes and all that follows the three words in question. These terms were not written in a vacuum, were not intended to be applied in a vacuum, and should not be considered by this court in a vacuum. They refer to the processes of an institution of higher

---

15. In distinguishing McAlpine, the majority commented that the statute under consideration in that case used the words "wilfully or maliciously," thus rendering it more definite. Scienter may be assumed to be implicit if such a reading of a statute will avoid raising difficult constitutional problems which any other application would present: Garner v. Board of Public Works, 341 U.S. 716, 724, 71 S.Ct. 909, 915, 95 L.Ed. 1317 (1951).

learning which cannot function if its administrators are locked out, its buildings burned down, its students intimidated, and the scholarly works of its faculty destroyed. The words, "disturb, interfere, and prevent," carry no greater burden of ambiguity than is the lot of language generally. The combination in which they occur, and the context in which they came into being are powerfully suggestive even to the least sophisticated.

The majority holds that these words used with the modifying phrase "in the course of" make this subsection unconstitutionally vague because the language *"might"* be read to apply to the "planning stages" of an event which "disturbs" university activities.[16] This is clutching at a straw. "In the course of" refers to the words that immediately follow, i. e., "disturbing, interfering with or preventing." This subsection makes no reference to "planning stages." While it is error to ignore "convicted in any court of record" and "the orderly conduct of the activities, administration or classes of an institution of higher learning," it compounds the error to add words to the legislation for the purpose of bolstering an argument that it is unconstitutional.

The majority shows concern for the unfortunate student who might commit a traffic violation or fail to carry his draft card during the course of a disturbance, pointing out that such a student could lose his financial assistance if (a) (3) is literally followed. I suppose this is true, and it is exactly for this reason that Pennsylvania placed discretion in PHEAA's hands. Had the legislature desired the unsparing, fanciful results envisioned by the majority, it would have eliminated the words which have been found to be vague. Thus, the statute could have directed the termination of all benefits to any student who had been

convicted in any court of record of any offense, or who had ever been expelled. This language would be definite, and immune to any challenge of overbreadth. It is paradoxical that the legislative effort to protect students from the harsh consequences of their own mistakes brings this case before us.

I would consider all of (a) (3)—not just a part of it. When the words in question are read in context, they are not unconstitutionally vague.

## VI. *Subsection (a) will not chill First Amendment rights and should not be declared void per se*

The majority opinion holds that subsections (a) (2) and (a) (3) are constitutionally overbroad. The doctrine of overbreadth is concerned with statutory language which deals with two classes of conduct: that which properly may be regulated by the state and that which may not be regulated because of constitutional guarantees. Courts strike at the evil in such a law by invalidating the unconstitutional applications as they arise, case by case, or if First Amendment freedoms are threatened, by declaring such a law void on its face and striking it down in toto.

My first criticism of the majority's reasoning as to overbreadth is its failure to specify exactly which constitutional rights it sees as being endangered by subsections (a) (2) and (a) (3). This is important because not all overbroad statutes should be declared void on their face.[17] Only those which threaten First Amendment freedoms should be treated in this summary fashion,[18] and subsection (c) provides, inter alia, " \* \* \* nothing in this section *shall* be construed to limit the freedom of any student to verbal expression of individual views and opinions." (emphasis added) Obviously, subsection (c) severely restricts any

16. See majority opinion, pages 1208–1209.

17. United States v. National Dairy Products Corp., 372 U.S. 29, 32, 36, 83 S.Ct. 594, 597, 600, 9 L.Ed.2d 561 (1963).

18. Dissenting opinion, Mr. Justice White, Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 852.

threat to a student's freedom of expression.

A declaration that a statute is void on its face is justified only by the favored status afforded First Amendment rights.[19] Such holdings recognize that a threat of sanctions may pose as potent a deterrent to the exercise of the freedom of expression as the actual application of sanctions. It is this "chilling effect" of an overbroad statute which allows the departure from the more traditional method of judging constitutionality only in the light of an established factual situation at the behest of someone with standing to complain about it.[20]

Even a perfunctory analysis of the application of subsections (a) (2) and (a) (3) shows the possibility of any chilling effect is remote.

These subsections enable PHEAA to withhold financial support for a student who has been expelled or convicted in a court of record. If they are to be any deterrence, a student must consciously refrain from some conduct protected by the First Amendment in which he would have engaged *except* for the threat contained in (a) (2) or (a) (3), i. e., the chill must come from the fear that financial aid will be lost, not from the fear of expulsion or conviction.[21] As a logical proposition, I find this possibility as difficult to accept as the notion that a swimmer would refrain from jumping into perilous water—not from fear of drowning, but from fear that if he does drown, his bathing suit might be taken from him.[22]

Three considerations have been suggested[23] to guide courts in determining when a law which endangers First Amendment rights should be declared void on its face.

1. "Degree of Overbreadth * * * a law ought not to be struck down for overbreadth unless it lends itself to a substantial number of impermissible applications * * * While it is true that even the most carefully drawn statutes may have some chilling effect on privileged activity, * * * still the presumption must be that only substantially overbroad laws set up the kind and degree of chill that is judicially cognizable. * * * "

2. *"Area of Impact * * *

" * * * A law may be substantially overbroad * * *, yet the area affected by the law taken as a whole may not to a substantial degree involve first amendment activities. For example, while conspiracy laws may affect people seeking to advocate viewpoints in the public forum, the activities affected in the great run of situations bear no colorable claim to first amendment protection. * * *

"Absent a proportionately significant impact on first amendment interests, an overbroad law may be expected to be valid in the great preponderance of applications. * * * "

3. *"Adjudicatory Alternatives—The third guideline concerns the availability of judicial techniques for excising speedily and effectively the potential bad applications of an overbroad law."

If these guidelines are valid, these subsections should not be declared void on their face. First of all, they do not lend

19. Cramp v. Board of Public Instruction of Orange County, Florida, 368 U.S. 278, 287, 82 S.Ct. 275, 281, 7 L.Ed.2d 285 (1961).

20. Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965).

21. There must be a full awareness and some thought process such as this: "I will engage in certain conduct though I know it may mean I will be expelled or convicted in a court of record."

More thought process must follow, then, "No, I won't because if I do I *may* lose my financial aid from PHEAA."

22. In an earlier part of its opinion, the majority cited Falcone v. Dantinne, 420 F.2d 1157 (3rd Cir. 1969), to prove that expulsion from school is a heavy sanction. The same language is relevant in weighing expulsion against possible loss of financial aid.

23. The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 858–862.

themselves to a substantial number of impermissible applications. By their very nature they can only affect a narrow range of factual situations, i. e., students who have been expelled or convicted, who thereafter continue their studies at an approved institution, and who are otherwise eligible for financial assistance. Secondly, by reason of subsection (c) their area of impact on First Amendment freedoms is limited to conduct which goes beyond the spoken and written word. Finally, Pennsylvania law provides for appeals from adverse administrative agency decisions directly to an appellate court.[24] Therefore, in the absence of an indication to the contrary there is a sufficient adjudicatory alternative to holding the act unconstitutional per se.

### VII. *Subsection (b) does not involve Fourth or Fifth Amendment rights.*

Subsection (b) provides:

Each institution * * * shall immediately furnish to the agency, the name and address of any student who is a resident of the Commonwealth of Pennsylvania who is expelled * * * for the reasons set forth in clause (2) of subsection (a) * * *, or of whom the institution * * * has knowledge that he has been convicted of offenses as set forth in clauses (1) and (3) of subsection (a) * * *

Plaintiffs contend that compliance with these requirements would violate a student's Fifth Amendment rights not to incriminate himself and his Fourth Amendment rights to be secure from unlawful search and seizures.

The majority rejects both arguments on the present state of the record: the Fifth Amendment claim because subsections (a) (2) and (a) (3) and part of (a) (1) have been dissected out earlier in the opinion, and the Fourth Amendment contentions on the basis that sufficient facts are not available to apply a test of reasonableness which the majority feels is appropriate.

While I concur that the plaintiffs' prayers for relief should be refused as to subsection (b), the expansive implications I find in these portions of the majority opinion compel me to reject its language.

As to the Fifth Amendment, the majority says:

Plaintiffs' claim that the reporting section violates the students' Fifth Amendment right not to incriminate themselves must fail. So long as subsection (a) (2) and (a) (3) have been stricken from the statute, the only "compelled" authorization which the student gives the university is to forward information it has regarding his felony convictions to PHEAA. The institution, of course, may report such information whether the student authorizes it or not.

As applicable here, the Fifth Amendment states:

No person * * * shall be compelled in any criminal case to be a witness against himself * * *

I can see no Fifth Amendment problems with this statute. It does not compel a student to report anything to anyone.[25] Subsection (b) imposes a duty only upon the institution, and a limited duty at that: to report a student's name, address, and the fact of expulsion or conviction (if known). Moreover, the information is not required as part of a "criminal case," [26] but to help PHEAA determine which among thousands of students

---

24. Such an appeal would be to the Commonwealth Court: Act of July 31, 1970, P.L. ——, Art. IV, § 403, 17 P.S. § 211.403.

25. The fact that he supplied his name and address to the institution does not bring the Fifth Amendment into play. Disclosure of name and address is an essentially neutral act: California v. Byers, 402 U.S. 424, 91 S.Ct. 1535, 1540, 29 L.Ed.2d 9 (1971).

26. The term used in the Fifth Amendment. Witnesses are compelled to incriminate themselves in non-criminal cases all the time.

are deserving of financial support and which are not.

Were the Fifth Amendment to be involved in the considerations of subsection (b), I am mystified as to how the striking of (a) (2) and (a) (3) affects, as the majority implies, the rights it guarantees. If there is no violation of the Fifth Amendment to require the institution to report a conviction for arson, a felony, I do not see how requiring it to report expulsion for burning down a building and thus disrupting activities would violate those self-same rights.

Finally, if the institution "*may* report the student whether he authorizes it or not," I wonder how the fact that the statute *requires* such a report changes anything with regard to the student's Fifth Amendment rights.

As to the Fourth Amendment, the majority states * * *

> We do not have sufficient undisputed facts on which to base a legal judgment * * * [since] resolution of plaintiffs' claims in this area turn on a determination of whether the seizure of the institution's records of a student compelled by the statute is reasonable."

As I understand the majority, it is saying that PHEAA's interests in knowing that a student has been convicted (and expelled if (a) (2) had not been invalidated earlier) must be balanced against the student's constitutional rights not to be subjected to search and seizure.

As an abstract proposition, this sounds fair enough—but where is the search and seizure? That which is being reported to PHEAA—i. e., name, address, and fact of conviction—is not in the custody of the student, is not his property, and does not come from him. Any test of reasonableness is inapt because there is no constitutionally protected right against which to balance the usefulness to PHEAA of the required information. I consider it an amazing extension of the Fourth Amendment to suggest that a student's right to be secure in his person, house, papers, and effects gives him a constitutionally protected right as to a college's house, papers, and effects just because his name and address[27] have been recorded there.

## VIII. *Abstention*

Finally, I believe this is a case which we should not pass upon until after the courts of Pennsylvania have been given an opportunity to interpret subsections (a) and (b). They have never had this chance. Although the Supreme Court has made it clear that federal courts should decide federal questions, Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (1967), one of the "special circumstances" which will justify abstention is the susceptibility of a statute to a construction that would avoid or modify the constitutional question. Recently the Supreme Court has referred to a state court's "remarkable job of plastic surgery upon the face of the ordinance" as a commendable effort to give the legislation a field of operation within constitutional limits: Shuttlesworth v. City of Birmingham, Ala., 394 U.S. 147, 153, 155, 89 S.Ct. 935, 940, 941, 22 L.Ed. 2d 162 (1969).

The majority's holding that subsection (a) (2) is overbroad turns on the meaning of the words, "lawful regulation or order."[28] The majority reasons that a

---

27. See California v. Byers, note 25, supra.

28. (a) (2) authorizes PHEAA to deny assistance to anyone who has been expelled for the refusal to obey a *lawful regulation or order*, which refusal, in the opinion of the institution, contributed to a disruption of its activities, administration, or classes. The report required in subsection (b) refers to expulsions under (a) (2). Thus an expulsion for some other reason need not be reported to PHEAA.

private university's regulations or orders might deny First Amendment freedoms and still be lawful because it has been held that the Fourteenth Amendment does not apply to the edicts of a private institution.

The leap from the proposition that private institutions need not afford Fourteenth Amendment due process to the assumption that First Amendment freedoms would therefore be denied to students by the courts of Pennsylvania spans a broad river of uncertainty, unmarked by any supporting stepping stones from Pennsylvania citations. They would be difficult to imagine. Pennsylvania's own constitution, Article 1, Section 7, guarantees free press and free spech. The Supreme Court of Pennsylvania has voided legislation which threatened freedom of expression and failed to provide for due process: William Goldman Theatres, Inc., v. Dana, 405 Pa. 83, 173 A.2d 59 (1961). It has maintained that vigorous argument and debate are essential for the existence and preservation of the United States: Clark v. Allen, 415 Pa. 484, 495, 204 A.2d 42 (1964).

It seems to me, if faced with the question, the courts of Pennsylvania might very well construe "lawful" to mean in accordance with law, recognize that the First Amendment is part of the law of the land, and therefore that the phrase, "lawful regulation or order" refers to that which would not contravene constitutional guarantees of free speech.

In view of my belief that this act should not be read as a penal statute, is not vague when its words are viewed in light of the decided cases and in the context of their use, is not overbroad because the possibility of its chilling First Amendment freedoms is remote, and is susceptible to constitutional construction by the state courts, I would dismiss the complaint.